HERBERT SPAUGH, CHAIRMAN, EMILY H. BELLOWS, J. G. CHRISTIAN, JR., JOHN P. HOBSON, BEN F. HUNTLEY, R. M. MAULDIN AND F. O. ROBERTS, MEMBERS OF THE BOARD OF SCHOOL COMMISSIONERS OF THE CITY OF CHARLOTTE, AND THE BOARD OF SCHOOL COMMISSIONERS OF THE CITY OF CHARLOTTE v. THE CITY OF CHARLOTTE.

(Filed 15 January, 1954.)

**1. Appeal and Error § 1—**

The jurisdiction of the Supreme Court is derivative, and where the court below has no jurisdiction the Supreme Court can acquire none by appeal.

**2. Judges § 2b—**

The jurisdiction of a special judge is limited to that granted him by the Constitution as implemented by statute.

**3. Courts § 2: Appeal and Error § 6c (1)—**

Objection to the jurisdiction may be made at any time during the progress of the action or controversy without action, and even in the absence of objection, the court will take cognizance thereof *ex mero motu.*

**4. Judges § 2b—**

In the district of his residence, a special judge has concurrent jurisdiction with the resident judge of the district and the judge regularly presiding over the courts of the district, to hear chambers matters, in or out of term.   Constitution of N. C., Art. IV, sec. 11; G.S. 7-58; G.S. 7-65.

**5. Same—**

Neither Ch. 1119, Session Laws of 1951, nor Ch. 1322, Session Laws of 1953, repeals G.S. 7-65 as amended by Ch. 78, Session Laws of 1951, giving special judges jurisdiction of chambers matters in the districts of their residences, the later acts being supplemental and not repugnant to the former in regard to the jurisdiction of special judges.

**6. Statutes § 13—**

Repeal of statutes by implication is not favored, and in order for a later statute to repeal a former statute by implication the statutes must be irreconcilable, or the intent to effect a repeal must be clearly apparent.

**7. Dedication § 1—**

Dedication of land to the use of the public may be made either in express terms or implied from the conduct of the owner manifesting an intent to set the land apart for the benefit of the public, and such dedication is effective immediately upon acceptance on the part of the public without regard to the length of time of its use by the public.

**8. Dedication § 6—**

Dedication of land to the public, once fully made, is irrevocable.

**9. Dedication § 1—**

A political subdivision of the State may dedicate lands owned by it to a particular public use.

**10. Same: Municipal Corporations § 24½: Schools § 6e—Held: Municipality dedicated land for school purposes and its use could not be diverted from this purpose without compensation to school authorities.**

The governing body of a municipality purchased a tract of land within the city with funds derived from other than school taxes, set aside a building thereon and a certain part of the land for use as a public graded school, and delivered possession of same to the school commissioners of the city. The school authorities went into possession and used the land for school purposes for a number of years. *Held:* There was a dedication of the property by the municipality for school purposes and an acceptance of the dedication by the school authorities, constituting an irrevocable dedication, and the property may not be diverted by the city to any use other than school purposes unless the school authorities are paid the reasonable market value of the land. This principle applies equally to land reacquired by the city and added to the school site for the purpose of enlarging its playground.

APPEAL by defendant from *Clarkson, Special Judge,* 17 September, 1953, in Chambers,—he being a duly appointed special judge of Superior Court, resident of the city of Charlotte, and Mecklenburg County, in the Fourteenth Judicial District of North Carolina.

Controversy without action submitted to the court, pursuant to provisions of G.S. 1-250, *et seq.,* for decision and determination of the question of the right of the City of Charlotte to use a lot or parcel of land known as the D. H. Hill School property within said city as a right of way for Independence Boulevard, a State highway, without paying to the Board of School Commissioners, to be used for public school purposes, a sum of money equal to the reasonable value of the property,—the record title to the property being in the city of Charlotte, but the property having been used exclusively for school purposes at all times since the year 1883.

The controversy here presented is built around substantially the following factual framework:

1. The individuals named as plaintiff are members of, and constitute the Board of School Commissioners of the city of Charlotte,—an agency of the State created by law and charged by Chapter 115 of the General Statutes of North Carolina and the various sections thereof with the duty of acquiring sites, erecting schoolhouses, administering the public school system within the Charlotte School Administrative Unit, and holding title to school property.

2. The city of Charlotte is a municipal corporation created according to law and holding title to all property belonging to said city.

3. The Board of School Commissioners of the city of Charlotte was originally created pursuant to the provisions of Chapter 138 of the Private Laws of the 1874-75 session of the General Assembly of North Carolina, material parts of which are: (1) Grant of authority to the Board

of Aldermen of the city of Charlotte to hold an election by ballot to ascertain the sense of the qualified voters of the city on the question of establishing and maintaining by taxation in the city, public graded schools, and the maximum rate of taxation for such purpose, and to elect two school commissioners from each ward, who should, in the event a majority of those voting on the "Aforesaid scheme," be in favor thereof, be charged with the carrying the same into effect,—the eight so elected to constitute a board, a majority of whom should be a quorum at all meetings duly called; and

(2) That the "said board of commissioners shall have power and authority to purchase sites and build schoolhouses in the city, open and regulate schools therein, appoint examiners, employ teachers and fix their salaries, prescribe courses of study, and, in general do whatever may be necessary to establish and continue within said city a good system of graded public schools, to be kept open at least nine months in the year, without charge, for the education of the children of the city, within the ages of six and twenty-one," and that "the said board shall be a body politic and corporate" under the name of "The School Commissioners of the City of Charlotte," with all the rights and powers of the school committees of the respective townships in addition to the powers in this act granted.

And in accordance with the provisions of said act, an election was held, within the corporate limits of the city of Charlotte, as then constituted, on the first Monday in June 1880, at which election the majority of the voters voted in favor of levying a tax for public or graded school purposes of one-tenth of 1% on property and a poll of $0.30.

4. Thereafter, on 16 January, 1882, the Board of School Commissioners, the members thereof having been elected as provided in said act, met and organized for the purpose of establishing and administering a public graded school system in the City of Charlotte, generally known and identified as "the graded school." And at all times since said date there has been operated and maintained within the Charlotte School Administrative District a public or graded school system under a Board of School Commissioners possessing all the rights and powers granted by the said act of 1874-75, and including all rights and powers vested in township school committees by Chapter 164 of the Public Laws of the 1876-77 Session of the General Assembly (should be Chapter 162) and Chapter 200 of the Public Laws of 1881 as provided in said act, except as such rights and powers may have been modified or changed by the Public Laws of the 1933 General Assembly, and subsequent enactments of said body.

5. On 16 April, 1883, the Board of Aldermen of the city of Charlotte, the official governing body of said city, in order to provide a permanent building for white school children in the Charlotte Graded Schools,

adopted an ordinance authorizing the purchase of the Carolina Military Institute property for $15,000. The ordinance read as follows: "Whereas public graded schools have been established in the city of Charlotte by a vote of the people, and

"Whereas buildings have been bought for the permanent use of the colored school, and it is indispensable for the success of the school for white children that a permanent building should be built or purchased for their use:

"Be it ordained by the Board of Aldermen that $15,000 of the money now in the City Treasury be and the same is hereby appropriated to purchase the property known as the 'Carolina Military Institute' property for the use of the city of Charlotte . . ."

And pursuant to this ordinance the sum of $15,000 was drawn from funds accumulated over a period of years prior to the then fiscal year, from sources other than school taxes, and in the City Treasurer, and the property was acquired by deed from J. H. Carson and others to the City of Charlotte, dated 16 April, 1883, and duly recorded. The property was a certain specifically described tract of land containing twenty-seven acres.

6. There was located on said tract of land at the time of the purchase, and is now, a three-story brick structure, known as the D. H. Hill School, which, "with the land adjacent thereto, is hereinafter more particularly identified and described." And the "Board of School Commissioners of the city of Charlotte took possession of the same as the location of a white graded school within the Charlotte School District, and at all times since then the building, with the adjacent land, hereinafter described, has been in the sole and exclusive custody and possession of the Board of School Commissioners and has been used solely and exclusively for public school purposes."

7. In the year 1886 the Board of Aldermen had the twenty-seven acres of land, described above, subdivided into a large number of lots, and a map made, and adopted as, and declared to be an official map and record of the City of Charlotte. And the Board caused the lot or parcel of land on which was located the three-story brick structure above referred to, "to be laid off, marked and set aside on said map as the Charlotte Graded School lot," lying "along the southerly side of East Morehead Street as now constituted and extending from South Boulevard to South Caldwell Street fronting approximately 300 feet or more on South Boulevard."

8. "At a meeting held on 24 May, 1886, the Board of Aldermen voted to sell part of said property not needed for school purposes, and it thereafter proceeded to sell" in reference to the map above referred to all the lots laid off on the map, and a later map, except the lot designated "Charlotte Graded School lot."

9. Among the lots sold by the Board of Aldermen in the year 1886, the city of Charlotte re-acquired from R. N. Littlejohn title to a specific part of certain lots "for the purpose of enlarging the playground of the D. H. Hill School" and same was added to the school site and used as a part of it. The fund for the purchase of this property came from the City Treasury.

10. That the record title to lot in controversy, specifically described, remains in the city of Charlotte.

11. The use of building on the lot in question was confined to class-room instruction and it was used continuously for such purposes from date of its acquisition until end of school term in June, 1937, when such use was discontinued on account of the fact that part of it had been condemned. Thereupon the School Board converted the building into store quarters for school furniture, school instruction supplies and janitorial supplies, and, in the main, has since so used it.

12. The city of Charlotte now proposes to use the D. H. Hill School lot as now constituted as a part of the city's contribution toward a right of way for the extension of Independence Boulevard, a State highway within the city,—that is, to raze the school building, and locate the Boulevard on the land. No compensation would be paid to the city except that the city would be given credit to the extent of the reasonable market value of the property toward the city's share of the cost of acquiring a right of way for the Boulevard, which the city has agreed to pay. The city does not propose to pay over to the Board of School Commissioners for its use for school purposes any amount as compensation for its conveyance of the property.

The contentions of the parties are:

(1) The Board of School Commissioners contend that the D. H. Hill School property as described in the agreed statement of facts is public school property and cannot legally be diverted to any other use unless said Board shall be first adequately compensated for it to the end that any funds received in compensation may be used for school purposes.

(2) The city of Charlotte contends that it is the owner of said property in fee simple, holding the record legal title thereto, and that the Board of School Commissioners has now, and, at all times referred to in the statement of agreed facts, has had only permissive use of property belonging to the city of Charlotte.

And the parties stipulated that if the court agree with the contention of the Board of School Commissioners, it shall be entitled to have and recover of the city of Charlotte the reasonable market value of said land before it can be conveyed by the city of Charlotte or put to the use as contemplated by the city. On the other hand, if the court should conclude that the contention of the city be correct, the Board shall recover nothing.

The cause came on for hearing before his Honor, Francis O. Clarkson, Special Judge of the Superior Court, resident in the Fourteenth Judicial District, and was heard in Chambers. And the Judge, after considering the matter, and hearing argument of counsel for the parties, concluded that "the property cannot be diverted to any use other than school purposes," and adjudged that "the said Board of School Commissioners have and recover of the city of Charlotte the reasonable market value of the D. H. Hill School site before the same be put to the use contemplated by the city as set forth in the agreed statement of facts."

Defendant City of Charlotte excepted thereto, and appeals to Supreme Court and assigns error.

*Brock Barkley for plaintiffs, appellees.*
*John D. Shaw for defendant, appellant.*

WINBORNE, J. While the parties to this controversy without action have not formally presented it, this Court is confronted with a question of jurisdiction suggested on the oral argument on this appeal, which must be determined before proceeding to consideration of the assignments of error.

The question is whether or not a special judge of the Superior Court has jurisdiction to hear and determine in Chambers a controversy without action in the county of his residence, when he has not been assigned by the *Chief Justice* to hold a term of court in such county? If a special judge of Superior Court does have such jurisdiction, this case is properly before the Supreme Court. But if he does not have such jurisdiction, the case is not before the Court. For the jurisdiction of the Supreme Court is derivative. *Shepard v. Leonard,* 223 N.C. 110, 25 S.E. 2d 445.

The jurisdiction of a special judge of the Superior Court over the subject matter of an action, or of a controversy without action, depends upon the authority granted to him by the Constitution and laws of the sovereignty, and is fundamental. McIntosh's N. C. P. & P. 7. *Stafford v. Gallops,* 123 N.C. 19, 31 S.E. 265. And objection to such jurisdiction may be made at any time during the progress of the action, or controversy without action. This principle is enunciated and applied in a long line of decisions in this State. See *Henderson Co. v. Smyth,* 216 N.C. 421, 5 S.E. 2d 136, where prior cases are listed, including *Burroughs v. McNeill,* 22 N.C. 297, and *Branch v. Houston,* 44 N.C. 85. See also *Lewis v. Harris,* 238 N.C. 642, and cases cited.

In *Burroughs v. McNeill, supra,* it is stated by *Gaston, J.,* that: "The instant that the court perceives that it is exercising, or is about to exercise, a forbidden or ungranted power, it ought to stay its action, and, if it does not, such action is, in law, a nullity."

And to like effect is *Branch v. Houston, supra,* where *Pearson, J.,* wrote: "If there be a defect, *e.g.,* a total want of jurisdiction apparent upon the face of the proceedings, the court will of its own motion, 'stay, quash, or dismiss' the suit. This is necessary to prevent the court from being forced into an act of usurpation, and compelled to give a void judgment . . . So, *ex necessitate,* the court may, on plea, suggestion, motion, or *ex mero motu,* where the defect of jurisdiction is apparent, stop the proceedings."

Moreover, in *Greene v. Stadiem,* 197 N.C. 472, 149 S.E. 685, opinion by *Stacy, C. J.,* filed 2 October, 1929, interpreting Art. IV, Sec. 11, of the N. C. Constitution, as it was then written, and pertinent statute as it then existed, P.L. 1929, Chap. 127, this Court held that a special judge to whom the controversy without action was submitted, by agreement of the parties, had not been commissioned by the Governor to hold a court in Lenoir County at the time of the signing the judgment, was without authority to determine the matter, and, hence, the proceeding was a nullity, being *coram non judice,* and the judgment void.

And in *Shepard v. Leonard, supra,* in opinion by *Barnhill, J.,* filed 28 April, 1943, likewise interpreting Art. IV, Sec. 11, of the N. C. Constitution, and pertinent statute, Chap. 41 of P.L. 1941, then in effect, it was held that Art. IV of Sec. 11 of the Constitution did not confer, or authorize the Legislature to confer any "in Chambers" or vacation jurisdiction upon a special judge assigned to hold a designated term of court, and the jurisdiction of a special judge was then limited to matters arising in the courts which he was duly appointed to hold.

But since these decisions were rendered both Art. IV, Sec. 11, and the statute in respect to special judges have been altered. Therefore, it seems appropriate that the Court here and now determine what jurisdiction is granted to a special judge in matters wholly in Chambers and in vacation, that is, when he is not assigned to hold a particular term of court.

Art. IV, Sec. 11, of the Constitution of North Carolina, as amended, pursuant to proposal submitted under Chap. 775 of 1949 Session Laws of North Carolina, and adopted at the general election on 7 November, 1950, declares in pertinent part, that "The General Assembly may provide by general laws for the selection or appointment of special or emergency Superior Court judges not assigned to any judicial district, who may be designated from time to time by the Chief Justice to hold court in any district or districts within the State; and the General Assembly shall define their jurisdiction . . ."

And in the Act. Chap. 775 of 1949 Session Laws, Sec. 5, it is provided that "all laws and clauses of laws in conflict with the provisions of this Act are hereby repealed."

Thereafter the General Assembly, at the 1951 session, implementing the authority conferred upon it by Art. IV, Sec. 11, of the Constitution, as so amended, passed two acts, Chap. 78 of 1951 Session Laws of North Carolina, relating to the jurisdiction of special judges of the Superior Court, ratified 20 February, 1951, and Chap. 88 of 1951 Session Laws of North Carolina, relating to the jurisdiction of emergency judges of the Superior Court, ratified 22 February, 1951. In the first Act. Chap. 78, the statute, G.S. 7-58, was rewritten and the statute, G.S. 7-65, was amended.

Sec. 1 of the Act reads as follows: "Special Superior Court Judges are hereby vested with the same power and authority in all matters whatsoever, in the courts in which they are assigned to hold, that regular judges holding the same courts would have. A special judge duly assigned to hold the courts of a County or judicial district shall have the same powers in the district in open court and in Chambers as the resident judge or any judge regularly assigned to hold the courts of the district would have, which jurisdiction in Chambers shall extend until the term is adjourned or the term expires by operation of law, whichever is later."

Sec. 2 reads: (a) G.S. 7-65 is hereby amended by inserting in line seven immediately following the word "and" the words "any special Superior Court Judge, residing in the district and."

And Sec. 2 reads: (b) G.S. 7-65 is hereby further amended by inserting in line 14 after the word "district" and in line 16 after the word "judge" the words "and any Special Superior Court Judge residing in the district."

Thus G.S. 7-65 as so amended was made to read in pertinent part (Italics ours) as follows: "In all cases where the Superior Court in vacation has jurisdiction, and all of the parties unite in the proceedings they may apply for relief to the Superior Court in vacation, or in term time, at their election. The resident judge of the judicial district and *any special Superior Court judge residing in the district* and the judge regularly presiding over the courts of the district, shall have concurrent jurisdiction in all matters and proceedings where the Superior Court has jurisdiction out of term: Provided, that in all matters and proceedings not requiring the intervention of a jury or in which trial by jury has been waived, the resident judge of the judicial district and *any special Superior Court judge residing in the district* shall have concurrent jurisdiction with the judge holding the courts of the district, and the resident judge and *any Special Superior Court judge residing in the district* in the exercise of such concurrent jurisdiction may hear and pass upon such matters and proceedings in vacation, out of term or in term time . . ."

And Sec. 3 of Chap. 78 of 1951 Session Laws, *supra,* declares that "All laws and clauses of laws in conflict with this Act are hereby repealed,"

and Sec. 4 makes the Act effective on ratification, and the Act was ratified 20 February, 1951.

Manifestly, the amendments to G.S. 7-65 vested a special judge of the Superior Court, resident of a particular district, with concurrent jurisdiction with the resident judge and the judge regularly presiding over the courts of the district in all matters and proceedings where the Superior Court has jurisdiction out of term, and with authority in the exercise of such concurrent jurisdiction, to hear and pass upon all such matters and proceedings in vacation, out of term or in term time.

But the General Assembly when it came later to make provision for the appointment of special judges, enacted Chap. 1119 of 1951 Session Laws, effective from ratification, and ratified 14 April, 1951, in substance the same as previous acts providing biennially for appointment of special judges of the Superior Court, beginning in the year 1941.

Sec. 5 of this Act as in previous biennial acts reads as follows: "To the end that such special judges shall have the fullest power and authority sanctioned by Art. IV, Sec. 11, of the Constitution of North Carolina, such judges are hereby vested in the courts which they are duly appointed to hold, with the same powers and authority in all matters whatsoever that regular judges holding the same courts would have. A special judge duly assigned to hold the courts of a particular county shall have during said term of court, in open court and in Chambers, the same powers and authority of a regular judge in all matters whatsoever arising in that judicial district that could properly be heard or determined by a regular judge holding the same term of court."

And Sec. 8 declares that "All laws and clauses of laws which may be in conflict with this Act, to the extent of such conflict, are hereby repealed: Provided, that nothing herein shall in any manner affect Secs. 7-50 and 7-51 of the General Statutes of North Carolina."

Therefore this question arises: Are the provisions of Chap. 78 of the 1951 Session Laws of North Carolina repealed by Sec. 8 of Chap. 1119 of the 1951 Session Laws? This Court is of opinion, and holds that the question merits a negative answer.

When the provisions of Sec. 1 of Chap. 78 of the 1951 Session Laws are compared with the provisions of Sec. 5 of Chap. 1119 of the 1951 Session Laws it is seen that the jurisdiction vested in special judges of the Superior Court in these two acts is substantially the same, and the two are not in conflict. Does then the authority of concurrent jurisdiction granted by the amendments to the statute G.S. 7-65 amount to a conflict with the provisions of Sec. 5 of Chap. 1119 of 1951 Session Laws? It is not considered that it is. Rather, it appears to be supplemental to the jurisdiction conferred by the provisions of Sec. 5. The latter relates to matters arising in the courts which the special judges of the Superior

Court are assigned to hold, and the former to in Chambers matters arising in the district of which the special judge of the Superior Court is a resident.

Indeed, repeal of statutes by implication is not favored in this State. As stated by *Adams, J.,* in *Story v. Comrs.,* 184 N.C. 336, 114 S.E. 493, "The presumption is against the intention to repeal where express terms are not used, and it will not be indulged if by any reasonable construction the statutes may be reconciled and declared to be operative without repugnance. 'To justify the presumption of an intention to repeal one statute by another, either the two statutes must be irreconcilable, or the intent to effect a repeal must be otherwise clearly expressed.'" See, among numerous others, the cases of *Kelly v. Hunsucker,* 211 N.C. 153, 189 S.E. 664; *S. v. Calcutt,* 219 N.C. 545, 15 S.E. 2d 9; *McLean v. Board of Elections,* 222 N.C. 6, 21 S.E. 2d 842.

And it may be noted the purpose and intent expressed in Sec. 5 were appropriate when the section was first incorporated in Chap. 51 of P.L. 1941, and when subsequent acts were biennially enacted, prior to the 1950 amendment to Art. IV, Sec. 11, of North Carolina Constitution. But by this amendment the previous limitation was removed and the General Assembly was given unlimited authority to define the jurisdiction of special judges of the Superior Court. Hence, it is apparent that the General Assembly in enacting Chap. 1119 of 1951 Session Laws was concerned with perpetuation of authority for the appointment of special judges of the Superior Court, rather than in defining their jurisdiction,— a thing already accomplished at the same session.

Moreover, it is observed that the statute, Chap. 1322 of 1953 Session Laws, providing for the appointment of special judges of the Superior Court for the biennium ending 30 June, 1955, is couched in almost identical language to that used in Chap. 1119 of 1951 Session Laws, above considered, except as to number of special judges authorized to be appointed. And, since the provisions of Chap. 78 of 1951 Session Laws are not found and held to be in conflict with the provisions of Chap. 1119 of 1951 Session Laws, they are not in conflict with the provisions of Chap. 1322 of 1953 Session Laws.

Therefore, this Court concludes that the Honorable Francis O. Clarkson, a special judge of Superior Court residing in the Fourteenth Judicial District of North Carolina, had jurisdiction ·in Chambers to hear and determine this controversy without action, which arose in the district of his residence.

Now, we come to the challenge to the ruling and judgment from which the appeal is taken. These are the questions presented:

(1) Where the board of aldermen of the city of Charlotte, acting in its capacity as the governing body of the city, did in the year 1883, with

funds in the treasury of the city and accumulated from sources other than school taxes, purchase a boundary of land on which was located a three-story brick structure, suitable for permanent use, and indispensable to the success of the system of public graded schools inaugurated pursuant to authority of the electorate of the city, and took title thereto in the name of the city, and, thereafter, set aside the building and a certain part of the land so purchased, as a graded school lot, and delivered possession of same to the school commissioners of the city of Charlotte,—a body politic and corporate, empowered and authorized to purchase sites and build schoolhouses in the city, and to regulate and operate within the city a system of graded public schools, who went into possession of the building and lot, and operated therein and thereon a public graded school for approximately fifty-four years, and continued to occupy same for public school purposes for approximately sixteen more years, do these facts constitute a dedication by the city of Charlotte, and an acceptance by the school commissioners of the city of Charlotte, of the property, building and lot, for a special public purpose?

(2) If so, is such dedication revocable by the city of Charlotte?

Principles generally recognized and applied dictate an affirmative answer to the first question, and a negative answer to the second.

"Dedication is the intentional appropriation of land by the owner to some proper public use. More specifically, it has been defined as an appropriation of realty by the owner to the use of the public and the adoption thereof by the public,—having respect to the possession of the land and not the permanent estate." Dedication may be either in express terms or it may be implied from conduct on the part of the owner. And dedication applies not only to highways, but, among other purposes and uses, to school lots. See 16 Am. Jur. 348, Dedication 2, and *Tise v. Whitaker,* 146 N.C. 374, 59 S.E. 1012.

In the *Tise case,* in opinion by *Hoke, J.,* this Court declared: "It is established that if there is a dedication by the owner, completed by acceptance on the part of the public, or by persons in a position to act for them, the right at once arises, and the time of user is no longer material." And again (quoting from Elliott on Roads and Streets, 2nd Ed.), " 'An implied dedication is one arising by operation of law from the acts of the owner. It may exist without any express grant, and need not be evidenced by any writing, nor, indeed, by any form of words, oral or written.' And further, on the question of intent (again quoting): 'It is essential that the donor should intend to set the land apart for the benefit of the public, for it is held, without contrariety of opinion, that there can be no dedication unless there is present the intent to appropriate the land to public use. If the intent to dedicate is absent, then there is no valid

dedication. The intent which the law means, however, is not a secret one, but is that which is expressed in the visible conduct and open acts of the owner. The public . . . have a right to rely on the conduct of the owner as indicative of his intent. If the acts are such as would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate, and they are so received and acted upon by the public, the owner cannot, after acceptance by the public, recall the appropriation. Regard is to be had to the character and effect of the open and known acts, and not to any latent or hidden purpose.' "

And in *Sexton v. Elizabeth City,* 169 N.C. 385, 86 S.E. 344, it is said: "The dedication, when once fully made, is held to be irrevocable."

Moreover, a political subdivision of the State may dedicate lands owned by it to a particular public use. 16 Am. Jur. 356.

In the light of these principles applied to the agreed statement of facts, it seems clear that the D. H. Hill School building and lot were acquired by the city, and delivered to the school committee with intent that it be dedicated to purpose of operating the city system of public graded schools, and that it was so accepted by the school committee in behalf of the public. Therefore, the city may not now revoke the dedication.

Indeed, the principle applies alike to the land re-acquired by the city, and added to the school site, for the purpose of enlarging the playground of the D. H. Hill School.

But there are no facts that indicate that there was a dedication of the remainder of the twenty-seven acre tract. Nor is there question of abandonment presented.

For reasons stated, the judgment below is

Affirmed.