NORTH CAROLINA STATE PORTS AUTHORITY v. FIRST-CITIZENS BANK & TRUST COMPANY AND WACHOVIA BANK & TRUST COMPANY.

(Filed 30 June, 1955.)

**1. Municipal Corporations § 8f—**

The statutes relating to the N. C. Ports Authority should be liberally construed to enable the Authority to accomplish the purposes of its creation, and a statute will not be given a construction that would tend to hamper the Authority in this respect unless plainly required by the express terms thereof. G.S. 143-228.

**2. Statutes § 13—**

A later statute will not repeal a former statute by implication unless it is in irreconcilable conflict therewith.

**3. Municipal Corporations § 8f—Ports Authority may issue bonds for new facility to be paid from revenues from such new facility.**

The State Ports Authority may issue valid bonds to raise funds for the construction of a particular new facility and secure the payment of such bonds solely from the revenues to be derived from such new facility. The issuance of such bonds is not precluded by Section 13, Chapter 820, Session Laws of 1949, requiring that net operating earnings of the Authority, after reserving operating capital and improvements, be paid to the State Treasurer for the State Ports Bond Sinking Fund, since the pledged revenues from the new facility do not involve revenues from any facility constructed by use of the proceeds of the State Ports Bonds, but to the contrary the general revenues of the Authority will be augmented by wharfage and dock charges of ships using such new facility.

**4. Same—**

The N. C. Ports Authority was created and empowered to act in order to accomplish the public purpose of developing and promoting the natural resources of the State and to expand the agricultural, industrial and commercial interests of the people of the State.

**5. Same—**

The validity of bonds issued for the purpose of constructing a grain handling facility at a State port is not affected by the fact that the bonds are to be paid solely from revenues from rental of the facility to a private corporation, since the new facility is to be used by lessee in the public interest for the purpose of providing additional facilities auxiliary and subordinate to the principal operations of the Port, and the fact that the lessee is a private corporation is incidental.

**6. Taxation § 6—**

The issuance of bonds to obtain funds for the construction of a new facility in connection with the operations of the State Ports Authority, which bonds are payable solely from revenues derived from the lease of such new facility to a private corporation, is not in effect a lending of the credit of the State to a private corporation in violation of Article V, sec. 4 of the Constitution of North Carolina, since such bonds do not constitute a debt of the State or of the State Agency by which they are issued.

APPEAL by defendants from *Fountain, Special J.,* March A Term 1955 of WAKE.

This action is for a declaratory judgment, G.S. 1-253 *et seq.,* determinative of the validity of $60,000 of Grain Handling Facility Revenue Bonds (Revenue Bonds) authorized and sold by the North Carolina State Ports Authority (Authority) to First-Citizens Bank & Trust Company (First-Citizens). If the Revenue Bonds are valid obligations of the Authority, First-Citizens is ready, able and willing to pay its bid and to consummate the purchase thereof; otherwise, it refuses to do so.

The Grain Handling Facility (Facility) was constructed by the Authority at its Morehead City Port. It occupies approximately two (2%) per cent of the available wharf and dock space at the port. It does not interfere in any way with the general operation and conduct of the business of the port. Prior to its construction, grain could not be handled satisfactorily for shipment from the port. The Facility will promote and facilitate the sale and shipment of grain produced in North Carolina, thereby increasing the business of the port.

The Revenue Bonds are payable solely from revenues to be derived from operation of the Facility, which revenues are pledged to secure payment thereof. They were authorized, issued and sold in conformity with the provisions of G.S. 143-219.

The Authority, an instrumentality of the State of North Carolina, was created in 1945. (Session Laws of 1945, ch. 1097; G.S. 143-216 *et seq.*). Express authority to issue and sell such revenue bonds was conferred upon the Authority by Section 4 of the 1945 Act. G.S. 143-219.

In 1949, the General Assembly provided for the issuance and sale of $7,500,000 of North Carolina State Ports Bonds (State Ports Bonds). These are not obligations of the Authority. They are direct obligations of the State of North Carolina, the full faith, credit and taxing power of the State being pledged for the payment thereof. The proceeds derived from the sale of State Ports Bonds were appropriated to the use of the Authority "for the purpose of construction, reconstruction, enlargement or improvement of seaports in North Carolina," etc. Wachovia Bank & Trust Company, joined as a party defendant, owns $40,000 of State Ports Bonds, and represents herein the owners of such bonds.

Section 13 of the State Ports Bonds Act, Session Laws of 1949, ch. 820, is worded as follows:

"Sec. 13. That the North Carolina State Ports Authority shall annually pay to the State Treasurer the net earnings of the operations conducted by the said Authority after reserving an amount deemed necessary by said Authority for operating capital and after reserving such amounts as may be deemed by said Authority proper and desirable for making enlargements, extensions and other improvements in the facilities of any North Carolina seaport, *provided* that the amounts reserved for such purposes above recited shall be approved by the Governor and Council of State. All amounts so paid to the State Treasurer shall be credited to a fund to be set up by the State Treasurer and designated as 'State Ports Bond Sinking Fund.'

"Until all bonds issued under this Act shall have been paid or provisions for such payment made, said fund shall be applied to the payment of the principal of and interest on said bonds as such principal

and interest become due, *provided, however,* that whenever and for so long as the amount in said fund exceeds an amount equal to the amount of such principal and interest then due or to become due within the next ensuing twelve months, the excess may, if the General Assembly shall authorize such application, be applied to other purposes. Subject to said proviso, the said fund is hereby pledged to the payment of the principal of and interest on said bonds as such principal and interest become due. Nothing in this Section shall be construed to modify the provisions of Section 9 of this Act."

On 1 December, 1954, the Authority determined that the Facility "was necessary and desirable and in the public interest." The need was considered so urgent that the Authority proceeded forthwith with the construction thereof, at an estimated cost of $80,000, advancing temporarily its operating funds to pay therefor as construction progressed. Provision for financing this new Facility, to replace the operating funds so advanced, was as follows: (1) $20,000 was to be reserved from the net earnings derived from the general operations of the Authority; and (2) $60,000 was to be obtained from the sale of the Revenue Bonds. In addition, the Authority authorized and executed a lease of the Facility to Cargill, Incorporated, (Cargill) for an initial term of five (5) years with the privilege of renewal for an additional five-year term. Relevant provisions of the lease are referred to in the opinion.

The Governor and Council of State, by appropriate formal action, have approved the action of the Authority with reference (1) to the said reservation of $20,000, (2) to the issuance and sale of the Revenue Bonds, and (3) to the pledge of the revenues from the Facility to secure payment of the Revenue Bonds.

The court below held that the $60,000 of Revenue Bonds are valid obligations of the Authority, in accordance with the terms thereof, and adjudged that First-Citizens pay its bid therefor and consummate the purchase thereof. Defendants excepted and appealed, assigning as error that "the court erred as to each and all of the findings of fact appearing in the judgment and in pronouncing judgment and signing of same as set forth in the record."

*Attorney General McMullan and Assistant Attorney General Moody for plaintiff, appellee.*

*Ward & Tucker for defendant First-Citizens Bank & Trust Company, appellant.*

*Womble, Carlyle, Sandridge & Rice for defendant Wachovia Bank & Trust Company, appellant.*

*Murray Allen and Norman C. Shepard as amici curiae.*

BOBBITT, J. Upon waiver of jury trial, the court found the facts. G.S. 1-262. The findings based on competent evidence, embrace all facts narrated in the foregoing statement and in this opinion.

The questions for decision are these: (1) Does Section 13 of the State Ports Bonds Act, quoted above, prohibit or suspend, as long as any of the State Ports Bonds remain outstanding and unpaid, the Authority's right to raise $60,000 of the cost of construction of the Facility by the issuance and sale of the Revenue Bonds and to pledge the revenues to be derived from the Facility to secure payment thereof? (2) If not, is the validity of the Revenue Bonds impaired by the fact that the only revenues from the Facility during the term of these bonds are rentals under a lease by the Authority to Cargill, a private corporation?

*In limine*, it is observed that present owners of State Ports Bonds, Wachovia and others, are not materially affected by decision of the questions presented. Only the residue, if any, of the net earnings, after the Authority, with the approval of the Governor and Council of State, has reserved the amount "deemed necessary" for operating capital and the amount deemed "proper and desirable" for making enlargements, extensions and other improvements in the facilities," is pledged to the payment of the State Ports Bonds. The State Ports Bonds being unconditional obligations of the State of North Carolina, it is apparent that the effect of the provisions of Section 13 of the State Ports Bonds Act upon the value thereof is infinitesimal.

Prior to 1 December, 1954, all funds made available to the Authority by the sale of State Ports Bonds had been used in the construction of docks, wharves and other permanent facilities. True, if the amount had been sufficient, a portion of such funds might have been used to pay the cost of construction of a grain handling facility. Such was not the case. Yet the lack of such facility rendered impossible an important use of the port, namely, the handling and shipment of grain.

It is to be noted that the Authority's action involves no pledge of revenues from any facility constructed by use of the proceeds derived from the sale of State Ports Bonds. To the extent ships are loaded or unloaded at the Morehead City Port in connection with the use of the Facility the general revenues of the Authority will be augmented by wharfage and dock charges. Thus, the Facility provides two new sources of revenue. Only the portion thereof derived from the operation of the Facility itself is pledged to secure the payment of the Revenue Bonds.

It is to be noted further that the Revenue Bonds are in no sense obligations of the State of North Carolina. Nor are they general obli-

gations of the Authority. They are payable solely from the revenues to be derived from *a new facility*.

Hence, the precise inquiry is whether the Authority, in order to raise the funds for the construction of *a particular new facility* that will enhance rather than impair its general operations and revenues, can lawfully issue bonds secured by and payable only from the revenues to be derived from *such facility*. The legislative intent, as manifested in relevant statutory provisions, is determinative.

The primary and public purposes for which the Authority was created are plainly declared in the 1945 Act. Adequate transportation facilities, by water as well as by land, stimulate economic growth by making possible the satisfactory and profitable marketing of the products of farm and factory. Conversely, lack of such facilities retards economic development. The General Assembly, in the exercise of its policy making powers, established the Department of Conservation and Development, G.S. 113-1 *et seq.*, to promote the conservation, development and profitable use of the natural resources of the State and to expand the agricultural, industrial and commercial interests of the people of the State. One of its more important projects was the promotion of, and later cooperation with, the Authority in its efforts to provide maximum development and use of our seaports. Recognizing this dominant intent of the General Assembly, no construction should be placed upon statutes relating to the Authority, unless plainly required by the express terms thereof, that would tend to hamper the Authority in its efforts to accomplish the very purposes of its existence.

It is significant that, subsequent to the State Ports Bonds Act of 1949, the General Assembly on three occasions amended the 1945 Act. Session Laws of 1949, ch. 892; Session Laws of 1951, ch. 1088; Session Laws of 1953, ch. 191. But these amendments did not repeal or amend Section 4 of the 1945 Act. Hence, Section 4 of the 1945 Act remains in full force and effect except to the extent, if any, it is in irreconcilable conflict with Section 13 of the State Ports Bonds Act. *Spaugh v. Charlotte*, 239 N.C. 149, 79 S.E. 2d 748, and cases cited. We find no irreconcilable conflict in relation to the question presented here. The conclusion reached is that Section 13 of the State Ports Bonds Act does not prohibit or suspend the Authority's right to raise $60,000 of the cost of construction of this particular new Facility by the issuance and sale of the Revenue Bonds and to pledge the revenues to be derived from the operation of this particular new Facility to secure the payment thereof.

There remains for consideration the lease to Cargill. In this connection, the Authority determined that its best interests required that the Facility be operated, at least for a limited time, by persons experi-

enced and successful in the operation of such facilities. Assisted by the Commissioner of Agriculture, the Authority approached Cargill. Cargill, a private corporation, had successfully operated such facilities and was further interested as an exporter of grain. Negotiations resulted in the lease by the Authority to Cargill of the Facility. Apparently, no other private corporation was interested in obtaining such lease. In any event, the lease is not challenged on any ground other than the absence of legal power in the Authority to lease the Facility to any such private corporation. The contention seems to be that the Facility cannot be operated otherwise than by the employees and personnel of the Authority itself.

The General Assembly has expressly declared its intention that a liberal construction be placed upon the power conferred upon the Authority to enable it to accomplish the purposes for which it was established. G.S. 143-228. To carry out such purposes, the power "to rent, lease, buy, own, acquire, mortgage, or otherwise encumber, and dispose of such property, real or personal," is expressly conferred. G.S. 143-218. We are concerned only with the leasing of a particular new specialized Facility, auxiliary and subordinate to the principal operations of the port.

No question arises here as to the validity of a lease of properties for some use unrelated to the accomplishment of the primary purposes of the Authority. The Facility affected by the lease under consideration is adapted for use only in such operations as will enlarge the principal operations of the port. It is a means incident to providing adequate facilities for the marketing and export of grain and for the increase of the port's overall business.

Close scrutiny impels the conclusion that the lease is advantageous both to the Authority and to the owners of the Revenue Bonds. It provides, in substance, that Cargill will pay, during the initial 5-year term, all costs of operation of the Facility and rentals sufficient to pay in full the $60,000 of Revenue Bonds. These revenue bonds mature within a 5-year period, $12,000 on the first day of January of each of the years 1956-60, inclusive. If Cargill exercises its option to renew the lease for an additional 5-year term, the annual rental during this additional 5-year term is an amount equal to 5% of the actual cost of the construction of the Facility. Thus, Cargill, during the original 5-year term, is obligated unconditionally to pay rentals sufficient in amount to retire the $60,000 of Revenue Bonds. If it elects to become the lessee for the additional five years, it will thereupon be obligated unconditionally to pay an additional amount approximating $20,000. In such case, the full cost of construction of this Facility will have been liquidated within ten years. Thereafter, all revenues from this Fa-

cility, whether in rentals from a lessee or otherwise, will become part of the general revenues of the Authority. Moreover, all along the Authority will be receiving, in addition to the rentals under the lease, wharfage and dock charges from ships loaded and unloaded in connection with the handling of grain through this Facility.

Beyond question, the Authority was created and empowered to act to accomplish a public purpose. *Webb v. Port Com.*, 205 N.C. 663, 172 S.E. 377. . In such case, the principle applicable, in relation to this public purpose, is stated in 1 Dillon on Municipal Corporations (5th Ed.), sec. 269, as follows: "Hence land taken for wharves is taken for a public purpose, although some portions of the land actually used may be thereafter, in the discretion of the city, divided off and placed in the exclusive possession of a lessee for the sole purpose of using it in the transaction of the necessary business connected with the loading and unloading of passengers and cargoes of ships and steamers."

The principle stated has been applied in seaport development cases: *Dyer v. Mayor, etc., of City of Baltimore,* 140 Fed. 880, appeal dismissed, 201 U.S. 650; *In re Mayor, etc., of New York,* 135 N.Y. 253, 31 N.E. 1043, 31 Am. St. Rep. 825; *Marchant v. Mayor and City Council of Baltimore,* 146 Md. 513, 126 A 884.

As aptly stated by *Peckham, J.,* in *In re Mayor, etc., of New York, supra:* "When used by lessees under the facts already stated, the use is a public one. The use is public while the property is thus leased, because it fills an undisputed necessity existing in regard to these common carriers by water, who are themselves engaged in fulfilling their obligations to the general public,—obligations which could not otherwise be properly or effectually performed."

The principle stated has been applied in housing development (slum clearance) cases: *Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693; *Herzinger v. Mayor & City Council of Baltimore,* 203 Md. 49, 98 A 2d 87; *Hunter v. Norfolk Redevelopment & Housing Authority,* 195 Va. 326, 78 S.E. 2d 893; *Berman v. Parker,* 348 U.S. 26, 99 L. ed. (Advance p. 63), 75 S. Ct. 98.

See also, *Lowell v. Boston,* 322 Mass. 709, 79 N.E. 2d 713; *Public Parking Authority v. Board of Property A. etc.,* 377 Pa. 274, 105 A 2d 165; *Albritton v. City of Winona,* 181 Miss. 75, 178 So. 799; 115 A.L.R. 1436.

The principal contention made by counsel for the Atlantic Coast Line Railroad Company, permitted to file brief herein as *amici curiæ,* is that the construction, financing and leasing of the Facility in effect constitutes lending the credit of the State to aid a private corporation, in violation of Art. V, sec. 4, Constitution of North Carolina. But the Revenue Bonds do not constitute debts either of the State of North

Carolina or of the Authority. This Court has held that such revenue bonds do not constitute "debts" of the State agency by which they are issued. *Brockenbrough v. Comrs.*, 134 N.C. 1, 46 S.E. 28; *Williamson v. High Point*, 213 N.C. 96, 195 S.E. 90.

We are in agreement with authority in other jurisdictions that a lease made for an adequate consideration is not a loan of the credit of the state or of the agency making such lease. *Miller v. Greater Baton Rouge Port Com.*, 225 La. 1095, 74 So. 2d 387; *City of Oakland v. Williams*, 206 Cal. 315, 274 P. 328.

In *Cline v. Hickory*, 207 N.C. 125, 176 S.E. 250, a lease by the City of Hickory of the auditorium in its municipal building to a private corporation for use as a motion picture theatre was upheld. Other portions of the building were used by departments of the City. It is noted that, under the facts presented, the operation of the theatre served no public purpose. However, the rentals inured to the general benefit of the City. See also, *Oil Co. v. Mecklenburg County*, 212 N.C. 642, 194 S.E. 114; Annotations, 63 A.L.R. 614 *et seq.*, and 133 A.L.R. 1241 *et seq.*

Where, as here, the lease of a particular specialized Facility aids and promotes the accomplishment of the primary and public purposes of the Authority, the fact that the lessee is a private corporation is incidental and not controlling.

For the reasons stated, the judgment of the court below is affirmed.

Affirmed.