STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; PUBLIC
SERVICE COMPANY OF NORTH CAROLINA, INC.; MCDOWELL COUN-
TY; MICHAEL F. EASLEY, ATTORNEY GENERAL; AND PUBLIC STAFF-
NORTH CAROLINA UTILITIES COMMISSION v. CAROLINA UTILITY
CUSTOMERS ASSOCIATION, INC.

No. 410PA93

(Filed 29 July 1994)

**1. Utilities § 27 (NCI4th)— natural gas—expansion fund—
Commission's discretion**

The Utilities Commission did not act under a misapprehen-
sion of applicable law and acted pursuant to a proper inter-
pretation of its authority and discretion under N.C.G.S. § 62-158
when it granted a petition to establish a natural gas expansion
fund financed by supplier refunds to local distribution com-
panies for the purpose of facilitating the expansion of natural
gas service to areas where it would not otherwise be feasible.
Although the Carolina Utility Customers Association (CUCA)
contends that the word "may" in the statute indicates that
the legislature intended the Commission to exercise more than
"limited discretion" in determining whether to authorize
establishment of the fund, the terms of the statute itself clear-
ly indicate that there are certain limitations on the Commis-
sion's authority. The General Assembly has clearly stated that
it is the policy of the state "[t]o facilitate the construction
of facilities in and the extension of natural gas service to
unserved areas in order to promote the public welfare," and
the Commission is not free to exercise its discretion with regard
to whether, in a general sense, this policy is wise or unwise.

**Am Jur 2d, Public Utilities §§ 235 et seq.**

**2. Utilities § 27 (NCI4th)— natural gas expansion fund—
creation—findings—benefit to service areas**

A review of the record as a whole in a Utilities Commis-
sion proceeding which established a natural gas expansion fund
reveals that there is substantial evidence to support the Com-
mission's findings concerning the economic development pros-
pects for Public Service Company's franchised but unserviced
areas and the potential benefits to existing customers in
unserviced areas. Although CUCA contends that economic
development cannot be predicted with certainty and that bare

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

expressions of opinion are not sufficient, the Commission heard testimony from numerous witnesses who were knowledgeable about the economic impact of natural gas facilities on local economies; their testimony was in turn supported by written reports and studies of the matter; and these studies are replete with empirical data that demonstrates the benefits of the extension of natural gas facilities to the unserved areas at issue.

**Am Jur 2d, Public Utilities §§ 235 et seq.**

**3. Utilities § 27 (NCI4th) — natural gas expansion fund — creation — findings — public interest**

The Utilities Commission did not err in entering an order establishing a natural gas expansion fund where CUCA contended that the Commission lacked evidentiary support for the decision to create the fund and for the level of initial funding for the fund. The General Assembly has already determined that it is the policy of this state to facilitate the construction of facilities in and the extension of natural gas service to unserved areas and the Commission was without authority to reconsider this policy decision.

**Am Jur 2d, Public Utilities §§ 235 et seq.**

**4. Utilities § 286 (NCI4th) — natural gas expansion fund — creation — findings — summary and rejection of argument**

The Utilities Commission did not err in an order establishing a natural gas expansion fund by not including a summary of CUCA's argument and the Commission's rejection of that argument. CUCA's argument engrafts a requirement upon N.C.G.S. § 62-79 that does not exist.

**Am Jur 2d, Public Utilities §§ 273 et seq.**

**5. Utilities § 286 (NCI4th) — natural gas expansion fund — creation — findings — amount of initial funding**

The Utilities Commission did not err in an order establishing a natural gas expansion fund by not including a summary and rejection of CUCA's arguments concerning the amount of the fund or the amount of initial funding, which appears to have been reasonable and in accordance with the policy and intent of the natural gas expansion legislation. N.C.G.S. § 62-158(c).

**Am Jur 2d, Public Utilities §§ 273 et seq.**

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

6. **Utilities § 210 (NCI4th) — Utilities Commission — constitutionality of statute — authority to determine**

The Utilities Commission did not have the authority to determine the constitutionality of N.C.G.S. § 62-2(9) or N.C.G.S. § 62-158 and properly declined to do so. Although N.C.G.S. § 62-60 provides that the Commission shall be deemed to exercise functions judicial in nature for certain purposes, as an administrative agency created by the legislature, the Commission has not been given jurisdiction to determine the constitutionality of legislative enactments.

**Am Jur 2d, Public Utilities §§ 264 et seq.**

7. **Constitutional Law § 34 (NCI4th) — Utilities Commission — establishment of natural gas expansion fund — not unconstitutional delegation of authority**

The natural gas expansion fund legislation is a proper delegation of legislative authority to an administrative agency because there are extensive procedural safeguards designed to ensure that the Utilities Commission carries out the expansion of natural gas facilities in a way that is consistent with the intent of the legislature and in furtherance of stated policies. This delegation of authority to the Commission meets the criteria outlined in *Adams v. Dept. of N.E.R. and Everett v. Dept. of N.E.R.*, 295 N.C. 683.

**Am Jur 2d, Constitutional Law § 339.**

8. **Constitutional Law § 135 (NCI4th) — natural gas expansion fund — not an exclusive emolument**

Legislation creating a natural gas expansion fund did not confer an exclusive emolument or privilege in violation of Article I, Section 32 of the North Carolina Constitution where, although residents of unserved areas would receive more benefit than other members of the public from the extension of natural gas service to their areas, the General Assembly clearly stated that the purpose of natural gas expansion is to "promote the public welfare throughout the State" and it is not difficult to see how the legislature could have concluded that expansion of natural gas facilities into previously unserved areas would be in the public interest.

**Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 128-138, 193 et seq.**

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

9. **Constitutional Law § 49 (NCI4th)— natural gas expansion fund—funding with supplier refunds—taking without compensation—due process—standing**

CUCA's contention that the Commission's transfer of supplier refunds to a natural gas expansion fund pursuant to N.C.G.S. § 62-158 amounts to an unconstitutional taking and a violation of due process was overruled because neither CUCA nor its members have an interest in the refunds sufficient to entitle them to constitutional protection from legislative action impacting upon the refunds. The very existence of supplier refunds is dependent upon the actions and rulings of the FERC and, should refunds to local distribution suppliers be mandated by FERC order, the Utilities Commission determines the eventual fate of these supplier refunds. Despite the fact that it has been the practice of the Commission to remit supplier refunds to customers of local distribution companies, past history is not determinative; until the Commission makes a decision to remit these supplier refunds to LDC customers, the interest of these customers in the refunds is nothing more than a mere expectation of receiving them.

Am Jur 2d, Constitutional Law § 190.

10. **Constitutional Law § 90 (NCI4th)— natural gas expansion fund—funding with supplier refunds—equal protection—no violation**

N.C.G.S. § 62-158 clearly bears a sufficient relationship to the legitimate goal of expanding natural gas facilities to unserved areas of the state to withstand a challenge that it violates the Equal Protection Clauses of the United States and North Carolina Constitutions. Expansion of natural gas facilities to unserved areas of the state is undoubtedly a legitimate governmental objective and, although CUCA contends that the use of supplier refunds means that the burden of financing the expansion fund is imposed only on existing customers while the economic benefits accrue to all North Carolina citizens, the legislation directs that the refunds be applied for a purpose that the General Assembly has determined to be for the benefit of the citizens of North Carolina, including both existing and future ratepayers.

Am Jur 2d, Constitutional Law §§ 748-751.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

11. **Constitutional Law § 28 (NCI4th)— natural gas expansion fund—supplier refunds—not a tax**

The use of supplier refunds in establishing a natural gas expansion fund does not constitute a tax that violates the requirements of Article V, Section 2 of the North Carolina Constitution because the monies making up the supplier refunds consist of payments made pursuant to rates set by the Commission in accordance with statutorily controlled standards and the capture of the refunds is not a charge levied upon the general citizenry for the general maintenance of the government. Additionally, unless the Commission makes the decision to order the refunds to be distributed to utilities customers, the utilities customers have no property interest in the refunds and the allocation of the refunds to the expansion fund does not amount to an unconstitutional tax.

**Am Jur 2d, State and Local Taxation §§ 1-9.**

On discretionary review pursuant to N.C.G.S. § 7A-31 prior to a determination by the Court of Appeals of an order of the North Carolina Utilities Commission establishing a natural gas expansion fund for Public Service Company of North Carolina and approving initial funding of the expansion fund pursuant to N.C.G.S. § 62-158 entered 3 June 1993 in Docket No. G-5, Sub 300. Heard in the Supreme Court 1 February 1994.

*Tharrington, Smith & Hargrove, by Wade H. Hargrove, William A. Davis, II, and Marcus W. Trathen, for applicant-appellee Public Service Co.*

*Michael F. Easley, Attorney General, by Jo Anne Sanford, Special Deputy Attorney General, and Karen E. Long, Assistant Attorney General, for intervenor-appellee Attorney General.*

*Robert P. Gruber, Executive Director, Public Staff, by Gisele L. Rankin, Staff Attorney, for intervenor-appellee Public Staff; and Hunter and Evans, P.A., by Robert C. Hunter, for intervenor-appellee McDowell County.*

*Byrd, Byrd, Ervin, Whisnant, McMahon & Ervin, P.A., by Sam J. Ervin, IV, for intervenor-appellant Carolina Utility Customers Assoc., Inc. (CUCA).*

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

MEYER, Justice.

In this case we decide, *inter alia*, the constitutionality of that portion of N.C.G.S. § 62-158 which authorizes the Utilities Commission to order a North Carolina natural gas local distribution company to create a natural gas expansion fund and which authorizes the Commission to use supplier refunds to such local distribution companies to fund the expansion fund. We also determine whether the North Carolina Utilities Commission ("the Commission") properly ordered the creation and funding of a natural gas expansion fund by Public Service Company of North Carolina pursuant to that statute. We hold that the statute is constitutional and that the Commission properly ordered the creation of the expansion fund and the funding thereof by supplier refunds.

In 1991, the General Assembly enacted two statutory sections for the purpose of facilitating the expansion of natural gas service to areas of the state where it would otherwise be economically infeasible to provide such service. The first of these is N.C.G.S. § 62-2(9), which states that it is the policy of the state

[t]o facilitate the construction of facilities in and the extension of natural gas service to unserved areas in order to promote the public welfare throughout the State and to that end to authorize the creation of an expansion fund for each natural gas local distribution company to be administered under the supervision of the North Carolina Utilities Commission.

N.C.G.S. § 62-2(9) (Supp. 1991). The second is N.C.G.S. § 62-158, which provides:

(a) In order to facilitate the construction of facilities in and the extension of natural gas service to unserved areas, the Commission may, after a hearing, order a natural gas local distribution company to create a special natural gas expansion fund to be used by that company to construct natural gas facilities in areas within the company's franchised territory that otherwise would not be feasible for the company to construct. . . .

(b) Sources of funding for a natural gas local distribution company's expansion fund may, pursuant to the order of the Commission, after hearing, include:

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

(1) Refunds to a local distribution company from the company's suppliers of natural gas and transportation services pursuant to refund orders or requirements of the Federal Energy Regulatory Commission;

(2) Expansion surcharges by the local distribution company charged to customers purchasing natural gas . . . ; and

(3) Other sources of funding approved by the Commission.

N.C.G.S. § 62-158 (Supp. 1991).

The refunds referred to in N.C.G.S. § 62-158(b)(1) are due to excessive rates charged on an interim basis to local distribution companies by their interstate pipeline suppliers subject to a later refund. When the Federal Energy Regulatory Commission ("FERC") establishes wholesale rates for natural gas, any excess amounts already paid by the local distribution companies to their interstate suppliers are subject to refund to the local companies pursuant to FERC order.

Public Service Company is a local distribution company ("LDC") within the meaning of N.C.G.S. § 62-158. On 22 May 1992, Public Service Company filed a petition to authorize establishment of an expansion fund with the North Carolina Utilities Commission. With this petition, Public Service Company requested that the Commission order the establishment of a natural gas expansion fund and approve the deposit of supplier refunds into the fund.[1] On 3 June

---

1. By its petition to authorize establishment of expansion fund dated 22 May 1992, Public Service Company sought approval to deposit a supplier refund in the amount of $5.8 million received in February 1992 into the expansion fund, plus previous supplier refunds amounting to approximately $150,000 received pursuant to FERC Docket No. RP 88-68 et al. ("Supplier Refund RP 88-68"). Public Service Company anticipated continuing payments of approximately $20,000 per month in connection with Supplier Refund RP 88-68.

In a supplemental request for approval of funding dated 11 September 1992, Public Service Company reported that the amount of the February 1992 refund was now $5,925,000 with interest and reported that Supplier Refund RP 88-68 now totaled $257,000 and that Public Service Company remained in anticipation of continuing refunds in the amount of $20,000 per month.

In this supplemental request, Public Service Company noted that the February 1992 refund was subject to appeal and suggested that "if this money is applied to the expansion fund, it should be maintained in a separate sub-account until this contingency is resolved." Also in this supplemental request, Public Service Company requested the transfer of another supplier refund in the amount of $4,288,946, received on 7 August 1992, into the fund, as well as a producer settlement payment of $51,526. The 7 August 1992 refund was no longer subject to appeal.

664 IN THE SUPREME COURT

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

1993, the Commission entered an order establishing an expansion fund for Public Service Company and directed Public Service Company to transfer certain supplier refunds to the Commission for deposit into the fund.[2]

Carolina Utility Customers Association ("CUCA") is an organization of utilities customers that frequently intervenes and participates in proceedings before the Commission. CUCA opposed the order in part because it wanted the supplier refunds that were used to fund the expansion fund to be returned to the customers of Public Service Company. As the Commission stated in its order:

> This Commission's practice has been to return such supplier refunds to customers consistent with the authority granted the Commission by G.S. 62-136(c). The Commission would have done so here but for the provisions of G.S. 62-158.

CUCA appeals the order of the Commission establishing the expansion fund, approving the level of initial funding for the fund, and ordering the transfer of the supplier refunds for deposit into the fund.

In this appeal of the Commission's order, CUCA challenges the procedures used by the Commission in the implementation of N.C.G.S. § 62-158 and challenges the validity of N.C.G.S. § 62-158 on numerous constitutional grounds. We shall first address CUCA's contentions that the Commission erred in its interpretation and implementation of the legislation at issue.

[1] In its first assignment of error, CUCA contends that the Commission misapprehended the scope of its discretion under N.C.G.S. § 62-158 in making the decision to grant or deny Public Service Company's petition. As the Commission stated in its order, "[o]nce we have found unserved areas that are otherwise infeasible to serve, . . . the General Assembly intends for the Commission to exercise limited discretion as to whether a fund should be created for that particular natural gas utility." CUCA argues that the Com-

---

2. In this order, the Commission directed the "transfer to the Commission for deposit in Public Service's expansion fund the sum of $4,774,840 as calculated in Hoard Exhibit 1, plus the additional monthly supplier refunds since calculation of Hoard Exhibit 1 and through July 1994," plus applicable interest. Hoard Exhibit 1 indicates that the sum of $4,774,840 is composed of (1) the 7 August 1992 supplier refund, $4,288,946; (2) the producer settlement payment of $51,526; (3) Supplier Refund RP 88-68 as increased by subsequent monthly refunds to a total of $357,333; and (4) accrued interest in the amount of $77,035.

**STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.**

[336 N.C. 657 (1994)]

mission in fact had wide discretion to determine whether to authorize the establishment of an expansion fund for any particular LDC and that the Commission's refusal to exercise its full discretion caused its failure to address CUCA's legal and factual position. Furthermore, CUCA contends that the order should be reversed because it constitutes a Commission decision based upon a misinterpretation of applicable law. *See State ex rel. Utilities Commission v. Haywood Electric Membership Corporation*, 260 N.C. 59, 69, 131 S.E.2d 865, 871-72 (1963).

CUCA bases its argument on that portion of N.C.G.S. § 62-158(a) that reads as follows:

(a) In order to facilitate the construction of facilities in and the extension of natural gas service to unserved areas, the Commission *may*, after a hearing, order a natural gas local distribution company to create a special natural gas expansion fund to be used by that company to construct natural gas facilities . . . .

N.C.G.S. § 62-158(a) (emphasis added). CUCA contends that the word "may" as contained in the statute is to be viewed in the permissive sense and indicates that the legislature intended that the Commission exercise more than "limited discretion" in determining, in light of all the surrounding facts and circumstances, whether authorizing the establishment of an expansion fund is appropriate.

Even if we adopt CUCA's interpretation of the Commission's authority, the record does not indicate that the Commission viewed itself as without discretion to grant or deny the petition. The Commission in fact stated that it was to exercise "limited discretion," as opposed to no discretion whatsoever.

The Commission held a hearing on the matter and received testimony from numerous witnesses who were either in favor of or opposed to the creation of the expansion fund. After doing so, the Commission issued an order that included extensive findings of fact. The Commission concluded that "the creation of an expansion fund for the Company is in the public interest."

In addition, the terms of the statute itself clearly indicate that there are certain limitations on the Commission's authority to order the creation of an expansion fund. N.C.G.S. § 62-158 limits the creation of expansion funds for the construction of natural

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

gas facilities to unserved areas in which it would otherwise be economically infeasible for the LDC to extend natural gas lines. In order to implement this statute, the Commission adopted Commission Rule R6-82, which requires that an LDC show "that there are unserved areas in the LDC's franchised territory and that expansion of natural gas facilities to such areas is economically infeasible." N.C. Utilities Commission, *North Carolina Public Laws and Regulations*, Rule R6-82(b) (1993 ed.) (Michie 1994) [hereinafter "Commission Rule"]. Such limitations are in keeping with the language of the enabling statute, N.C.G.S. § 62-158. In addition, Rule R6-82(d) states:

> In determining the establishment of a Fund and the sources and magnitude of the initial funding, the Commission will consider the LDC's showing that expanding to serve unserved areas is economically infeasible and such other factors as the Commission deems reasonable and consistent with the intent of G.S. 62-158 and G.S. 62-2(9). Before ordering the establishment of a Fund, the Commission must find that it is in the public interest to do so.

Commission Rule R6-82(d). The plain language of this rule indicates that the Commission had a proper view of its discretion in making a determination of whether to authorize the creation of an expansion fund: It was to evaluate pertinent factors in a manner consistent with the legislative intent; if, after doing so, the Commission concluded that the creation of an expansion fund would not be in the public interest, it would presumably decline to order the creation of such a fund. Because the General Assembly has clearly stated that it is the policy of the state "[t]o facilitate the construction of facilities in and the extension of natural gas service to unserved areas in order to promote the public welfare," N.C.G.S. § 62-2(9), the Commission is not free to exercise its discretion with regard to whether, in a general sense, this policy is wise or unwise.

We hold that the Commission did not act under a misapprehension of applicable law and that it granted the petition and established the expansion fund pursuant to a proper interpretation of its authority and discretion to do so. CUCA's assignment of error on these grounds is overruled.

[2] In its next assignment of error, CUCA contends that the Commission's factual findings concerning the economic development prospects for Public Service Company's franchised but unserviced areas

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

lack evidentiary support. CUCA says the same for the Commission's factual findings concerning the potential benefits to existing customers in Public Service Company's unserviced areas.

The Commission found as fact that:

8. The General Assembly has made the policy decision that it is necessary and in the public interest to authorize special funding methods, including the use of supplier refunds and customer surcharges, to facilitate the construction of facilities and the extension of natural gas service into areas of the State where it may not be economically feasible to expand with traditional funding methods in order to provide infrastructure to aid industrial recruitment and economic development.

9. The establishment of an expansion fund for Public Service for the purpose of constructing transmission lines into unserved counties in its territory that are otherwise infeasible to serve in order to provide infrastructure to aid industrial recruitment and economic development is consistent with G.S. 62-158 and 62-2(9) and is in the public interest.

10. Expansion of natural gas facilities in the unserved areas by use of expansion funds can reasonably be expected to assist in the economic development of unserved areas in Public Service's franchised territory. The availability of natural gas service is an important factor in industrial recruitment. Economic development will in turn provide a larger tax base, more employment opportunities, and a better quality of life.

As support for these findings, the Commission recited the following evidence adduced at the hearing:

Several witnesses addressed the issue of public interest in their testimony, and the Commission finds that this testimony bolsters the finding of public interest in this case. Mr. Dickey testified:

Expansion of natural gas service into these [unserved] areas will improve the chances for industrial development in portions of the State which presently are unable to attract certain gas-consuming industries. Industrial expansion will bring jobs, additional residential and commercial development, and increases in tax base to these counties.

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

Mr. Abernathy and Mr. Harmon, based on their extensive experience in industrial development activities, testified that approximately one-third of all potential industries seeking to relocate list natural gas as a requirement. Mr. Edwards testified similarly. Mr. Glass testified that natural gas "means jobs, it means lower industrial costs, a better qualify [sic] of life for our citizens." He further stated, "In the past six years, we have greatly improved our educational system, dramatically enlarged our water distribution system, sought regional cooperation in other public services, such as solid waste and recycling. Natural gas is the missing link in the chain that will strengthen public services in our county." Similarly Mr. Birdsong testified that "natural gas is one of those items that is important when you're talking about economy growth." This testimony tends to show that expansion of natural gas facilities into unserved areas by use of expansion funds will assist in the economic development of unserved areas in Public Service's franchised territory.

CUCA contends that these bare expressions of opinion of various witnesses are not sufficient to support the Commission's finding that the introduction of natural gas facilities into the areas would "reasonably be expected to assist in the economic development of unserved areas." Accordingly, CUCA argues, the Commission's order fails to satisfy the requirements of N.C.G.S. § 62-65(a), which states in pertinent part that "no decision or order of the Commission shall be made or entered in any such proceeding unless the same is supported by competent material and substantial evidence upon consideration of the whole record." N.C.G.S. § 62-65(a) (1989). We hold that the Commission's findings on this matter are properly supported by the evidence.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Comr. of Insurance v. North Carolina Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977). A review of the record indicates that the Commission heard testimony from numerous witnesses who were knowledgeable about the economic impact of natural gas facilities on local economies. Their testimony was in turn supported by written reports and studies of the matter, which were also presented to the Commission for its consideration. These studies are replete with empirical data that demonstrates the benefits of the extension of natural gas facilities to the unserved areas

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

at issue. Simply put, the Commission heard ample evidence adequate to support its finding that the introduction of natural gas facilities into the unserved areas at issue would assist in the economic development of those areas.

CUCA refers many times to the fact that economic development cannot be predicted with certainty. Notwithstanding this reality, a review of the record reveals that there is substantial evidence to support the findings of the Commission.

CUCA makes a similar argument with regard to the Commission's Finding of Fact No. 11, that "[c]ustomers on Public Service's system stand to benefit from the expansion to be made possible by the expansion fund. These benefits include increased throughput, which tends to reduce expenses per unit of gas sold." Again, we hold that the Commission's finding in this regard was supported by substantial evidence. In the portion of the order designated "Evidence and Conclusions for Findings of Fact Nos. 6-11," the Commission noted that Mr. Dickey

> testified that there is benefit to all gas customers to the extent that economic development does occur, in that it will tend to lower overall rates in the future (or moderate increases in rates that might otherwise occur) due to the spreading of fixed costs over larger volumes.

On the other hand, Mr. Dickey admitted that "we do not know as a fact what will happen because it's dependent upon whether industry and the associated residential and commercial development actually occurs in these counties."

In determining whether the record as a whole supports the findings of the Commission, we note that "[t]his Court's statutory function is not to determine whether there is evidence to support a position the Commission did not adopt. We ask, instead, whether there is substantial evidence, in view of the entire record, to support the position the Commission *did* adopt." *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 355, 358 S.E.2d 339, 347 (1987). A review of the record as a whole reveals that there is substantial evidence to support the findings of the Commission. We therefore affirm the decisions of the Commission with respect to these findings.

[3] In its next assignment of error, CUCA contends that the Commission erred in entering an order that lacked evidentiary support for what CUCA contends are the material issues in the matter,

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

the decision to create an expansion fund and the level of initial funding for the fund.

CUCA argued before the Commission that in order to determine whether the fund should be created, the Commission was required to engage in a weighing process in accordance with its own mandate that "[b]efore ordering the establishment of a Fund, the Commission must find that it is in the public interest to do so." Commission Rule R6-82(d). CUCA presented evidence and testimony before the Commission that demonstrated that it would be impossible to predict with any certainty whether the anticipated economic development expected as a result of the creation of the fund would occur. In addition, CUCA presented evidence designed to show that it would not occur. CUCA now contends that the Commission erred when it did not engage in a balancing process, or cost/benefit analysis, to determine whether the creation of an expansion fund in this case was in fact in the public interest. CUCA further contends that the Commission's order lacks the "summary of the appellant's argument and its rejection of the same," *State ex rel. Utilities Comm. v. Conservation Council of North America*, 312 N.C. 59, 62, 320 S.E.2d 679, 682 (1984), as required by N.C.G.S. § 62-79(a), and therefore must be reversed. We disagree.

CUCA's arguments in this regard can more properly be viewed as an attempt to have the Commission reanalyze the policy decisions made by the General Assembly in the enactment of N.C.G.S. § 62-158. The General Assembly has already determined that it is the policy of this state "[t]o facilitate the construction of facilities in and the extension of natural gas service to unserved areas in order to promote the public welfare throughout the State." N.C.G.S. § 62-2(9). The Commission was without authority to reconsider this policy decision, and despite the fact that there was evidence that economic development was uncertain or would not occur, "[t]he Commission . . . is not required to comment on 'every single fact or item of evidence presented by the parties.'" *Eddleman*, 320 N.C. at 351, 358 S.E.2d at 345 (quoting *State ex rel. Utilities Comm. v. Nantahala Power and Light Co.*, 313 N.C. 614, 745, 332 S.E.2d 397, 474 (1985), *rev'd on other grounds*, 476 U.S. 953, 90 L. Ed. 2d 943 (1986) ). It is furthermore not necessary that the Commission evaluate the evidence based upon CUCA's faulty interpretation of N.C.G.S. § 62-158, with which CUCA implies that the Commission is required to redetermine the economic values inherent in facilitating the construction of natural gas facilities in an unserved area, a

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

task already undertaken by the General Assembly. To the extent that the General Assembly has already done so, it has effectively declared that the establishment of an expansion fund is in the public interest.

[4] CUCA further contends that the Commission's order is deficient because it lacks a "summary of the appellant's argument and its rejection of the same." *State ex rel. Utilities Comm. v. Conservation Council of North Carolina*, 312 N.C. at 62, 320 S.E.2d at 682. By making this argument, CUCA engrafts a requirement upon N.C.G.S. § 62-79 that does not exist. All that is required under N.C.G.S. § 62-79 is that

> [a]ll final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:
>
> (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and
>
> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (1989). This statute does not require that an order of the Commission contain the "summary of the appellant's argument" referred to in *State ex rel. Utilities Comm. v. Conservation Council of North Carolina*, 312 N.C. 59, 320 S.E.2d 679,[3] if the order taken as a whole is "sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings" and contains the necessary findings of fact and conclusions of law, N.C.G.S. § 62-79(a). We hold that the order is sufficient to do so, and CUCA's assignment of error on these grounds is overruled.

---

3. The portion of *State ex rel. Utilities Comm. v. Conservation Council of North Carolina* to which CUCA refers is the following: "The Commission's summary of the appellant's argument and its rejection of the same is sufficient to enable the reviewing court to ascertain the controverted questions presented in the proceeding. That is all that G.S. § 62-79(a) requires." 312 N.C. at 62, 320 S.E.2d at 682. We do not read this as *requiring* a summary and rejection of each argument before the Commission, but only as an indication that the manner in which the order was promulgated in that particular case was sufficient to enable the Court to properly engage in its review.

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

[5] CUCA makes a similar argument with regard to the amount of funding authorized for the expansion fund. CUCA's position before the Commission was that, if the expansion fund was to be established at all, the amount of initial funding should be nominal because Public Service Company had not formally proposed specific expansion projects. CUCA contends that the Commission could have rationally concluded that the insertion of a significant amount of money into the expansion fund would have been unduly burdensome to Public Service Company's existing ratepayers and that because the Commission's order lacks a summary of its argument, it is insufficient. Again, we decline to impose the requirement that Commission orders contain a summary and rejection of each argument presented before it. In addition, we hold that the Commission properly authorized the initial funding based upon its findings of the economic infeasibility of extending natural gas service to currently unserved areas.

In making the determination that the expansion of natural gas service to unserved areas is economically infeasible, the Commission is required to adhere to the requirements of N.C.G.S. § 62-158(c), which states that "[o]nly those projects with a negative net present value shall be determined to be economically infeasible for the company to construct." The Commission's own rules define net present value as "[t]he present value of expected future net cash inflows over the useful life of a Project minus the present value of net cash outflows." Commission Rule R6-81(b)(3). If the projected costs associated with a project are greater than the expected returns of the project, the project has a "negative net present value" and is economically infeasible for the company to construct. The record indicates that Public Service Company demonstrated that extension of natural gas service into its unserved areas had a negative net present value. The record also indicates that the Commission had before it documentation showing that the amount of initial funding requested was insufficient to fully offset this negative net present value. Thus, even if the entire amount of funds requested by Public Service Company was dedicated to the extension of natural gas service to the unserved areas in its franchised territory, the projects would nonetheless remain economically infeasible. The level of funding authorized by the Commission is less than what would be required for Public Service Company to "break even" on the construction of natural gas facilities in presently unserved areas. Accordingly, the amount of funding

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

authorized by the Commission appears to have been reasonable and in accordance with the policy and intent of the natural gas expansion legislation, and we see no reason to overturn the decision of the Commission on·this point. CUCA's assignment of error on these grounds is overruled.

[6] In its next assignment of error, CUCA contends that the Commission erred when it determined that it did not have the authority to determine the constitutionality of N.C.G.S. § 62-158.[4] CUCA argues that the Commission has this authority pursuant to N.C.G.S. § 62-60, which provides:

> For the purpose of conducting hearings, making decisions and issuing orders, and in formal investigations where a record is made of testimony under oath, the Commission shall be deemed to exercise functions judicial in nature and shall have all the powers and jurisdiction of a court of general jurisdiction as to all subjects over which the Commission has or may hereafter be given jurisdiction by law.

N.C.G.S. § 62-60 (1989). CUCA takes the position that this statute gives the Commission the authority to determine the constitutionality of the legislation at issue. We disagree.

We addressed this question in a similar context in *Great American Insurance Co. v. Gold*, 254 N.C. 168, 118 S.E.2d 792 (1961), *overruled on other grounds by Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976), where an insurance company sought a declaratory judgment in order to have the Fireman's Pension Fund created by the legislature declared unconstitutional. In that case, the Court asked the following pertinent question and answered it:

> Quaere: Does a quasi-judicial board of the executive branch of government have jurisdiction to pass upon the constitutionality of a statute? Administrative boards have only such authority as is properly conferred upon them by the Legislature. The question of constitutionality of a statute is for the judicial branch.

---

4. In Finding of Fact No. 3, the Commission stated that "[t]he Commission has no authority to rule on CUCA's motion to dismiss the Petition in this proceeding on grounds that G.S. 62-158 is unconstitutional." In so finding, the Commission adhered to a ruling made pursuant to another expansion proceeding, Docket No. G-21, Subs 306 and 307.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

*Id.* at 173, 118 S.E.2d at 796; *see also In re Appeals of Timber Cos.*, 98 N.C. App. 412, 415, 391 S.E.2d 503, 505 (1990) ("Property Tax Commission is without authority to rule on the constitutionality of [statute]"); *Johnston v. Gaston County*, 71 N.C. App. 707, 713, 323 S.E.2d 381, 384 (1984) ("constitutional claims will not be acted upon by administrative tribunals").

N.C.G.S. § 62-23 provides:

> The Commission is hereby declared to be an administrative board or agency of the General Assembly created for the principal purpose of carrying out the administration and enforcement of this Chapter, and for the promulgation of rules and regulations and fixing utility rates pursuant to such administration . . . . In proceedings in which the Commission is exercising functions judicial in nature, it shall act in a judicial capacity as provided in G.S. 62-60.

N.C.G.S. § 62-23 (1989). Again, N.C.G.S. § 62-60 provides that, for certain purposes, "the Commission shall be deemed to exercise functions judicial in nature and shall have all the powers and jurisdiction of a court of general jurisdiction *as to all subjects over which the Commission has or may hereafter be given jurisdiction by law.*" (Emphasis added.) As an administrative agency created by the legislature, the Commission has not been given jurisdiction to determine the constitutionality of legislative enactments. We hold that the Commission did not have the authority to determine the constitutionality of N.C.G.S. § 62-2(9) or N.C.G.S. § 62-158 and properly declined to do so.

[7] CUCA now seeks to have this Court determine that the legislation at issue here is unconstitutional.

CUCA's constitutional challenges to the legislation at issue concern the Commission's authority to create the expansion fund and the Commission's authority to order the use of supplier refunds to fund the expansion fund.

So that we may resolve CUCA's constitutional challenges in an orderly manner, we first address the contention that the creation of the expansion fund is an unconstitutional exercise of Commission authority.

In its first challenge to the Commission's authority to order the creation of an expansion fund, CUCA contends that the expan-

**STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.**

[336 N.C. 657 (1994)]

sion fund scheme is an unconstitutional delegation of legislative power to the Commission because the Commission is vested with too much discretionary power with regard to the decision to order the creation of an expansion fund. As CUCA concedes, however, "we have repeatedly held that the constitutional inhibition against delegating legislative authority does not preclude the legislature from transferring adjudicative and rule-making powers to administrative bodies provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers." *Adams v. Dept. of N.E.R. and Everett v. Dept. of N.E.R.*, 295 N.C. 683, 697, 249 S.E.2d 402, 410 (1978). "[T]he General Assembly cannot delegate a portion of its legislative power to subordinate agencies or units of government without accompanying such a delegation with adequate guiding standards to govern the exercise of the delegated power." *Northampton County Drainage District Number One v. Bailey*, 326 N.C. 742, 748, 392 S.E.2d 352, 356 (1990). The principal inquiry to be made in assessing the constitutionality of a grant of legislative authority is "to insure that the decision-making by the agency is not arbitrary and unreasoned and that the agency is not asked to make important policy choices which might just as easily be made by the elected representatives in the legislature." *Adams*, 295 N.C. at 697-98, 249 S.E.2d at 411 (quoting Peter G. Glenn, *The Coastal Management Act in the Courts: A Preliminary Analysis*, 53 N.C. L. Rev. 303, 315 (1974) ). In undertaking such an analysis, this Court has listed certain factors to be considered. These include (1) "declarations by the General Assembly of the legislative goals and policies which an agency is to apply when exercising its delegated powers," and (2) "whether the authority vested in the agency is subject to procedural safeguards." *Id.* at 698, 249 S.E.2d at 411.

After applying these principles to the case *sub judice*, we conclude that the expansion fund legislation at issue is a proper delegation of legislative authority to an administrative agency.

The General Assembly amended the declaration of policy section of Chapter 62 to state clearly that it is the policy of the state

[t]o facilitate the construction of facilities in and the extension of natural gas service to unserved areas in order to promote the public welfare throughout the State and to that end to authorize the creation of an expansion fund for each natural gas

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

local distribution company to be administered under the supervision of the North Carolina Utilities Commission.

N.C.G.S. § 62-2(9). In addition, within the legislation itself, there are extensive procedural safeguards designed to ensure that the Commission carries out the expansion of natural gas facilities in a way that is consistent with the intent of the legislature and in furtherance of the stated policies. These safeguards specifically include a direction that "[t]he Commission shall ensure that all projects to which expansion funds are applied are consistent with the intent of this section and G.S. 62-2(9)." N.C.G.S. § 62-158(c). This portion of the statute goes on to direct that

[i]n determining economic feasibility, the Commission shall employ the net present value method of analysis on a project specific basis. Only those projects with a negative net present value shall be determined to be economically infeasible for the company to construct. In no event shall the Commission authorize a distribution from the fund of an amount greater than the negative net present value of any proposed project as determined by the Commission. If at any time a project is determined by the Commission to have become economically feasible, the Commission may require the company to remit to the expansion fund or to customers appropriate portions of the distributions from the fund related to the project, and the Commission may order such funds to be returned with interest in a reasonable amount to be determined by the Commission. Utility plant acquired with expansion funds shall be included in the local distribution company's rate base at zero cost except to the extent such funds have been remitted by the company pursuant to order of the Commission.

N.C.G.S. § 62-158(c). The Commission is also directed to "report to the Joint Legislative Utility Review Committee on the operation of any expansion funds in conjunction with the reports required under G.S. 62-36A." N.C.G.S. § 62-158(d). We hold that this delegation of authority to the Commission meets the criteria outlined in *Adams*; accordingly, CUCA's assignment of error on these grounds is overruled.

[8] CUCA next contends that the legislation at issue violates that part of the North Carolina Constitution which provides that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

of public services." N.C. Const. art. I, § 32. CUCA argues that the legislation creates a private benefit only for those residents of unserved areas, therefore constituting an exclusive emolument prohibited by our Constitution.

That residents of unserved areas would receive more benefit than other members of the public from the extension of natural gas service to their areas is not determinative of the question of whether the act constitutes exclusive or separate emoluments in violation of our Constitution. "[N]ot every classification which favors a particular group of persons is an 'exclusive or separate emolument or privilege' within the meaning of the constitutional prohibition." *Lowe v. Tarble*, 312 N.C. 467, 470, 323 S.E.2d 19, 21 (1984). The prohibition against exclusive emoluments or privileges is not implicated when the enactment is intended for "the promotion of the general welfare, as distinguished from the benefit of the individual, and if there is reasonable basis for the Legislature to conclude that the granting of the [benefit] would be in the public interest." *State v. Knight*, 269 N.C. 100, 108, 152 S.E.2d 179, 184 (1967). In the present case, both of these requirements are met. The General Assembly clearly stated that the purpose of natural gas expansion is to "promote the public welfare throughout the State." N.C.G.S. § 62-2(9). In addition, it is not difficult to see how the legislature could have concluded that expansion of natural gas facilities into previously unserved areas would be in the public interest. As stated in the declaration of policy of the Public Utilities Act, "it has been determined that the rates, services and operations of public utilities . . . are affected with a public interest *and that the availability of an adequate and reliable supply of electric power and natural gas to the people, economy and government* of North Carolina is a matter of public policy." N.C.G.S. § 62-2 (emphasis added). We conclude, therefore, that the legislation at issue here does not confer an exclusive emolument or privilege in violation of Article I, Section 32 of the North Carolina Constitution.

[9] We now turn our attention to CUCA's contention that the use of supplier refunds as a source of funding of the natural gas expansion fund is violative of several provisions of the state and federal constitutions.

With regard to CUCA's constitutional challenges to the capture of supplier refunds, it first contends that the capture of supplier refunds for the purpose of funding the expansion fund con-

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

stitutes a taking without compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and the "law of the land" clause of Article I, Section 19 of the North Carolina Constitution.

CUCA further contends that the use of supplier refunds to fund the expansion of natural gas lines to unserved areas violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and, again, the "law of the land" clause of Article I, Section 19 of the North Carolina Constitution. Because we hold that neither CUCA nor the companies represented by CUCA have a property interest in the refunds at issue, these contentions are rejected.

Invocation of constitutional protection against takings without just compensation or without due process requires a property interest on the part of the person seeking such protection. Where there is no property interest, there is no entitlement to constitutional protection. To have a property interest that is subject to procedural due process protection, the individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law. *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134 (4th Cir. 1990). The supplier refunds in the present case do not qualify as such a vested benefit.

"A vested right, entitled to protection from legislation, must be something more than a *mere expectation* based upon an anticipated continuance of the existing law; *it must have become a title*, legal or equitable, *to the present or future enjoyment of property, a demand, or legal exemption from a demand by another*."

*Armstrong v. Armstrong*, 322 N.C. 396, 402, 368 S.E.2d 595, 598 (1988) (quoting *Godfrey v. State*, 84 Wash. 2d 959, 963, 530 P.2d 630, 632 (1975) ).

In the present case, the very existence of supplier refunds is dependent upon the actions and rulings of the FERC. Should refunds to LDCs be mandated by FERC order, their subsequent distribution to the customers of the LDC then becomes a matter governed by N.C.G.S. § 62-136(c), which states in pertinent part:

If any refund is made to a distributing company operating as a public utility in North Carolina of charges paid to the

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

company from which the distributing company obtains the energy, service or commodity distributed, the Commission may, in cases where the charges have been included in rates paid by the customers of the distributing company, require said distributing company to distribute said refund plus interest among the distributing company's customers in a manner prescribed by the Commission.

Accordingly, the Commission is to determine the eventual fate of these supplier refunds. Apart from the decision to direct the distribution of refunds to utilities customers, the Commission is authorized to apply refunds to other purposes, for instance, to legal fees and travel expenses incurred when it appears before federal or state courts on behalf of the users of public utility service. N.C.G.S. § 62-48(b) (1989). Presumably, the entire amount of supplier refunds could be so dedicated, leaving no surplus for distribution to LDC customers.

We also note that subsequent to the 1981 amendments to N.C.G.S. § 62-136(c), which governs the distribution of supplier refunds, "the Commission is now empowered to order the distribution of supplier refunds to either current or past customers, utilizing whatever method the Commission deems most appropriate." *State ex rel. Utilities Commission v. Public Service Co.*, 307 N.C. 474, 480, 299 S.E.2d 425, 429 (1983). In addition, it is no longer required that the refunds be returned to the customers in proportion to the charges paid by them. *Id.* Implicit in these rulings is the proposition that it makes no difference that a customer who receives a refund might not have paid any rates that composed the source of the refund. Accordingly, the existence of a property interest in the refunds has not been the basis of a Commission decision to order an LDC to distribute the refunds to its customers, and N.C.G.S. § 62-136(c) does not, by virtue of its existence, create anything more than a mere expectation that LDC customers will receive a refund distribution.

It is clear that customers of an LDC cannot know whether, when, or in what amount supplier refunds will be made to them pursuant to N.C.G.S. § 62-136(c). Despite the fact that it has been the practice of the Commission to remit supplier refunds to customers of local distribution companies, past history is not determinative of the question of the nature or existence of the customers' interest in the refunds. Until the Commission makes a decision to remit

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

these supplier refunds to LDC customers, the interest of these customers in the refunds is nothing more than a mere expectation of receiving them.

When viewed in the overall framework of utilities regulation, it becomes apparent that rights in the refunds at issue do not automatically vest in LDC customers in the event that they are created by FERC order. Instead, the refunds to the LDC come under the supervision of the Commission until such time as it makes a determination with regard to the disposition of the refunds. This remains true until the Commission, pursuant to N.C.G.S. § 62-136(c), makes the determination to create such rights on behalf of the customers. Until that time, the utilities customers have no vested interest in the refunds.

Neither CUCA nor its members have an interest in the refunds sufficient to entitle them to constitutional protection from legislative action impacting upon the refunds. Accordingly, CUCA's contention that the Commission's transfer of supplier refunds to the expansion fund pursuant to N.C.G.S. § 62-158 amounts to an unconstitutional taking and a violation of due process is overruled.

[10] CUCA next contends that the use of supplier refunds to fund the expansion fund is a violation of the Equal Protection Clauses of the United States and North Carolina Constitutions because the burden of financing the expansion fund mechanism is imposed only upon existing customers, while the economic benefits created by the expansion of natural gas lines will accrue to all North Carolina citizens.

With regard to challenges to legislation on grounds that the law violates the right to equal protection, we have said

that the principle of the equal protection of the law, made explicit in the Fourteenth Amendment to the Constitution of the United States, was also inherent in the Constitution of this State even prior to the revision thereof at the General Election of 1970. By the above mentioned revision, it has now been expressly incorporated in Art. I, § 19, of the Constitution of North Carolina, effective 1 July 1971.

*S.S. Kresge Co. v. Davis*, 277 N.C. 654, 660, 178 S.E.2d 382, 385 (1971) (citations omitted). "The North Carolina cases applying the equal protection clause of the state and federal constitutions to challenged classifications have used the same test the federal courts

**STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.**

[336 N.C. 657 (1994)]

use[ ] . . . ." *Duggins v. North Carolina State Board of Certified Public Accountant Examiners*, 294 N.C. 120, 131, 240 S.E.2d 406, 413 (1978).

A claim that legislation violates the Equal Protection Clause is to be evaluated under one of two levels of review. The first of these entails "strict scrutiny" of the challenged legislation; this level of review is required when the challenged legislation impacts upon a "suspect class"[5] or a "fundamental right."[6] *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 49 L. Ed. 2d 520, 524 (1976); *see also Texfi Industries, Inc. v. City of Fayetteville,* 301 N.C. 1, 269 S.E.2d 142 (1980). This level of review "requires the government to demonstrate that the classification is necessary to promote a compelling governmental interest." *Texfi*, 301 N.C. at 11, 269 S.E.2d at 149.

The second level of review, which is used when the legislation at issue does not impact upon a suspect class or a fundamental right, involves a determination of whether the "challenged classification bears *any* reasonable relation to the purpose of the statute." *Duggins*, 294 N.C. at 131, 240 S.E.2d at 413 (emphasis added). Since the legislation at issue here does not involve a suspect class or a fundamental right, our inquiry is limited to this lower level of review. "[S]tate economic regulatory classifications need bear only a rational relationship to a legitimate governmental objective in order to withstand an equal protection challenge." *State ex rel. Utilities Commission v. Edmisten*, 294 N.C. 598, 611, 242 S.E.2d 862, 870 (1978).

Expansion of natural gas facilities to unserved areas of the state is undoubtedly a legitimate governmental objective. *Id.* With regard to the contention that the legislation does not bear a rational

---

5. Suspect classes heretofore identified by the United States Supreme Court include: alienage, *Graham v. Richardson*, 403 U.S. 365, 29 L. Ed. 2d 534 (1971); race, *McLaughlin v. Florida*, 379 U.S. 184, 13 L. Ed. 2d 222 (1964); and ancestry, *Oyama v. California*, 332 U.S. 633, 92 L. Ed. 249 (1948).

6. Fundamental rights heretofore identified by the United States Supreme Court include: rights of a uniquely private nature, *Roe v. Wade*, 410 U.S. 113, 35 L. Ed. 2d 147 (1973); the right to vote, *Bullock v. Carter*, 405 U.S. 134, 31 L. Ed. 2d 92 (1972); the right of interstate travel, *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651, 39 L. Ed. 2d 662 (1974); rights guaranteed by the First Amendment, *Williams v. Rhodes*, 393 U.S. 23, 21 L. Ed. 2d 24 (1968); and the right to procreate, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 86 L. Ed. 1655 (1942).

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

relationship to the ends sought, it has been held that the relationship need not be a perfect one, but that the legislature need only have had a reasonable basis for concluding that the measures taken would assist in the accomplishment of the goal. *See Duggins*, 294 N.C. at 131, 240 S.E.2d at 413 ("if the challenged classification bears any reasonable relation to the purpose of the statute it will not be set aside merely because it results in some inequalities in practice").

In the present case, the legislation directs that the refunds be applied for a purpose that the General Assembly has determined to be for the benefit of the citizens of North Carolina, including both existing and future ratepayers. The utilization of the refunds in the manner prescribed by the expansion fund scheme will result in a direct furtherance of the goal sought to be accomplished by the legislature: expansion of natural gas facilities to unserved areas. We have already determined that existing LDC customers have no cognizable property interest in the supplier refunds that are to be used for this purpose. The burden upon existing customers, if any, does not necessitate a finding that the legislation is wholly irrational and without reasonable basis. The same is true given the fact that heretofore unserved citizens may derive equal or greater benefits from the extension of natural gas services, although they did not pay the rates that resulted in the subsequent refunds.

We hold that N.C.G.S. § 62-158 clearly bears a sufficient relationship to the legitimate goal of expanding natural gas facilities to unserved areas of the state to withstand a challenge that it violates the Equal Protection Clauses of the United States and North Carolina Constitutions. Accordingly, CUCA's challenge to the legislation on these grounds is overruled.

[11] In its next assignment of error, CUCA contends that the capture of supplier refunds for use in establishing an expansion fund constitutes a tax that violates the requirements of Article V, Section 2 of the North Carolina Constitution, which provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." N.C. Const. art. V, § 2(1). CUCA contends that the payments required of existing ratepayers are not used for a public purpose but are used to subsidize the extension of economic benefits to the individuals and private businesses

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSN.

[336 N.C. 657 (1994)]

of unserved areas. Accordingly, CUCA argues, the scheme violates Article V, Section 2 of the North Carolina Constitution.

This Court has defined a tax as "a charge 'levied and collected as a contribution to the maintenance of the general government . . . . [It is] imposed upon the citizens in common at regularly recurring periods for the purpose of providing a continuous revenue . . . .'" *State ex rel. Dorothea Dix Hospital v. Davis*, 292 N.C. 147, 156, 232 S.E.2d 698, 705 (1977) (quoting *Tarboro v. Forbes*, 185 N.C. 59, 62, 116 S.E. 81, 82 (1923)). The capture of supplier refunds does not conform to this definition of a tax.

The monies making up the supplier refunds consist of payments made pursuant to rates set by the Commission in accordance with statutorily controlled standards. The capture of the refunds is not a charge levied upon the general citizenry for the general maintenance of the government. The capture and dedication of supplier refunds to an expansion fund is not a tax.

In addition, amounts refunded to local distribution companies cannot be characterized as payments made by natural gas utilities customers. We have previously stated that because an independent agency, the FERC, causes refunds to be made to local distribution companies, a property interest in the funds is not suddenly created in these refunds on behalf of natural gas customers. It is true that the Commission may order the refunds to be distributed to utilities customers, but its authority to do so does not amount to a directive that it must always be done. Unless the Commission makes the decision to do so, the utilities customers have no property interest in the refunds; accordingly, the allocation of the refunds to the expansion fund does not amount to an unconstitutional tax. CUCA's assignment of error on these grounds is overruled.

To conclude, we hold that N.C.G.S. § 62-158 as enacted pursuant to the General Assembly's declaration of policy in N.C.G.S. § 62-2(9) is a constitutional exercise of legislative authority and that the Commission properly authorized, established, and funded the challenged expansion fund pursuant to the authority lawfully delegated to it by the legislature. The order of the Commission is affirmed.

AFFIRMED.