CHARLES HEATHERLY; THOMAS SPAMPINATO; W. EDWARD GOODALL, JR.; PAUL STAM; WAKE COUNTY TAXPAYERS ASSOCIATION; AND THE NORTH CAROLINA FAMILY POLICY COUNCIL, PLAINTIFFS, WILLIS WILLIAMS; NORTH CAROLINA FAIR SHARE; AND NORTH CAROLINA COMMON SENSE FOUNDATION, PLAINTIFF-INTERVENORS v. STATE OF NORTH CAROLINA; CHARLES A. SANDERS, BRYAN E. BEATTY, LINDA CARLISLE, ROBERT A. FARRIS, JR., JOHN R. McARTHUR, JIM WOODWARD, AND ROBERT W. APPLETON, MEMBERS OF THE NORTH CAROLINA LOTTERY COMMISSION, IN THEIR OFFICIAL CAPACITY; NORTH CAROLINA LOTTERY COMMISSION; THOMAS N. SHAHEEN, EXECUTIVE DIRECTOR OF THE NORTH CAROLINA EDUCATION LOTTERY, IN HIS OFFICIAL CAPACITY; MICHAEL F. EASLEY, GOVERNOR OF THE STATE OF NORTH CAROLINA, IN HIS OFFICIAL CAPACITY; RICHARD H. MOORE, TREASURER OF THE STATE OF NORTH CAROLINA, IN HIS OFFICIAL CAPACITY, DEFENDANTS

No. COA06-770

(Filed 18 March 2008)

**1. Constitutional Law— state constitution—Lottery Act—not a revenue bill**

The Lottery Act does not meet the conditions to be considered a revenue bill and was not required to be passed pursuant to the requirements of N.C. Constitution, Article II, Section 23. The Lottery Act neither pledges the faith of the State for payment of a debt nor attempts to raise money on the credit of the State. Moreover, given the voluntary nature of participation in the lottery, the Lottery Act does not impose any tax upon the people of the State.

**2. Costs— assessed against plaintiffs—findings relevant—no abuse of discretion**

The trial court did not abuse its discretion by ordering plaintiffs and the plaintiff-intervenors to pay the costs of litigation challenging the N.C. Lottery Act. Findings that were challenged as irrelevant (concerning the timing of the action and the ongoing preparation for the lottery) bore directly on the question of whether the trial court employed reason when exercising its discretion to assess costs.

Judge CALABRIA dissenting.

Appeal by plaintiffs from order entered 21 March 2006 by Judge Henry W. Hight, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 22 May 2007.

*North Carolina Institute for Constitutional Law, by Robert F.
Orr and Jeanette Doran Brooks, for plaintiffs-appellants
Charles Heatherly, Thomas Spampinato, W. Edward Goodall,
Jr., Paul Stam, Wake County Taxpayers Association, and the
North Carolina Family Policy Council.*

*North Carolina Justice Center, by Jack Holtzman, for plaintiff-
intervenors-appellants Willis Williams and the North Carolina
Common Sense Foundation.*

*Attorney General Roy Cooper, by Special Deputy Attorneys
General Norma S. Harrell and Ronald M. Marquette, for
defendant-appellee the State of North Carolina.*

*Maupin Taylor, P.A., by Charles B. Neely, Jr. and Kevin W.
Benedict, for amicus curiae the Tax Foundation.*

WYNN, Judge.

To pass constitutional muster, revenue bills must, *inter alia*, be
"read three several times in each house of the General Assembly and
passed three several readings, which readings shall have been on
three different days."[1] Here, Plaintiffs argue that the trial court erred
in holding that the North Carolina Education Lottery Act is not a rev-
enue bill and thus was not required to be enacted under the mandated
constitutional procedural requirements. Because we conclude that
the Lottery Act was not a bill "enacted to raise money on the credit of
the State, or to pledge the faith of the State directly or indirectly for
the payment of any debt, or to impose any tax upon the people of the
State,"[2] we agree with the trial court that the Lottery Act does not
constitute a revenue bill.

In December 2005, Plaintiffs Charles Heatherly, Thomas
Spampinato, W. Edward Goodall, Jr., Paul Stam, the Wake County
Taxpayers Association, and the North Carolina Family Policy
Council, brought an action under the Uniform Declaratory Judgment
Act challenging the constitutionality of the Lottery Act. Plaintiffs
allege that the Lottery Act violates Article II, Section 23 of the North
Carolina Constitution, which requires that all revenue bills meet cer-
tain constitutional mandates in their enactment into law. Indeed, all
parties to the lawsuit agree that the Lottery Act was not passed in

---

1. N.C. Const. art. II, § 23.

2. *Id.*

compliance with those requirements, outlined in Article II, Section 23 of the North Carolina Constitution, as the Lottery Act did not receive the requisite three readings on three separate days, nor were the yeas and nays properly entered. As such, the lawsuit filed by Plaintiffs turns on the question of whether the Lottery Act is, indeed, a revenue bill, such that its passage must comply with the provisions of Article II, Section 23 of the North Carolina Constitution. Plaintiffs further contend that the Lottery Act violates Article V, Section 7 of the North Carolina Constitution, which prohibits the drawing of money from the State treasury except in consequence of appropriations made by law.

On 30 August 2005, the General Assembly passed the Lottery Act providing for the creation of the North Carolina State Lottery Commission ("the Lottery Commission"):

> There is created the North Carolina State Lottery Commission to establish and oversee the operation of a Lottery. The Commission shall be located in the Department of Commerce for budgetary purposes only; otherwise, the Commission shall be an independent, self-supporting, and revenue-raising agency of the State. The Commission shall reimburse other governmental entities that provide services to the Commission.

N.C. Gen. Stat. § 18C-110 (2005). Governor Michael Easley signed the Lottery Act into law the following day. Under the Lottery Act, the State provided ten million dollars to the Lottery Commission for start-up costs, and the agency began moving forward with hiring employees, entering into contracts, and engaging in other activities necessary for the establishment of a lottery.

In addition to the creation of the Lottery Commission, the Lottery Act established the North Carolina State Lottery Fund as an enterprise fund within the state treasury, "appropriated to the Commission and may be expended without further action of the General Assembly for the purposes of operating the Commission and the lottery games." *Id.* § 18C-160. Moreover, the Lottery Act specified the types of revenue income to be deposited into the North Carolina State Lottery Fund: "(1) [a]ll proceeds from the sale of lottery tickets or shares[;] (2) [t]he funds for initial start-up costs provided by the State[;] (3) [a]ll other funds credited or appropriated to the Commission from any source[; and] (4) [i]nterest earned by the North Carolina State Lottery Fund." *Id.* § 18C-161.

The Lottery Act earmarked the proceeds of the lottery to fund education-related projects. Specifically, the Lottery Act provides for total annual revenues from the lottery to be allocated in the following manner, "[t]o the extent practicable": at least fifty percent for prizes to the general public; at least thirty-five percent for the Education Lottery Fund; no more than eight percent for lottery expenses; and no more than seven percent for compensation paid to lottery game retailers. *Id.* § 18C-162(a). The net revenues from the North Carolina State Lottery Fund "shall be transferred periodically to the Education Lottery Fund, which shall be created in the State treasury." *Id.* § 18C-164(a). In turn, the remaining net revenue of the Education Lottery Fund is designated to support reduction of class size in early grades, to the Public School Building Capital Fund, and to the State Educational Assistance Authority to fund college and university scholarships. *Id.* § 18C-164(c). Additionally, the Lottery Act states that, from the Education Lottery Fund, "the Commission shall transfer a sum equal to five percent (5%) of the net revenue of the prior year to the Education Lottery Reserve Fund[,]" which will be used to make up for any shortfall between actual net revenues and the amount of funds appropriated by the General Assembly for projects in a given year. *Id.* § 18C-164(b), (d), (e).

After the filing of the initial complaint, Plaintiff-Intervenors Willis Williams and the North Carolina Common Sense Foundation moved to intervene on 21 December 2005. On 31 December 2005, Plaintiffs moved for a preliminary injunction to enjoin Defendants from proceeding with implementation of the Lottery Act. Defendants thereafter filed a motion to dismiss on 18 January 2006. On 13 February 2006, the trial court allowed the motion to intervene and heard Plaintiffs and Defendants on the other two motions. On 15 February 2006, the trial court denied the motion for preliminary injunction and granted Defendants' motion to dismiss for failure to state a claim upon which relief may be granted as to Plaintiffs' two counts alleging that the Lottery Act unconstitutionally created an express tax on residents and non-residents, respectively.

Following a final hearing, the trial court entered an order on 23 March 2006, dismissing Plaintiffs' claims alleging that the Lottery Act unconstitutionally raises money on the credit of the State for the payment of lottery winnings, pledges the faith of the State for the payment of a debt, and creates an implicit tax, for failure to state claims upon which relief could be granted. The trial court also dismissed all of the claims asserted by the corporate Plaintiffs, namely, Wake

County Taxpayers Association, the North ·Carolina Family Policy Council, and the North Carolina Common Sense Foundation, for lack of standing, and assessed the costs of litigation to Plaintiffs.

Plaintiffs appeal, arguing that the trial court erred by (I) holding that the Lottery Act was not a revenue bill and thus, did not constitute legislation within the purview and mandates of Article II, Section 23 of the North Carolina Constitution; (II) holding that the corporate plaintiffs Wake County Taxpayers Association, the North Carolina Family Policy Council, and the North Carolina Common Sense Foundation lacked standing to prosecute their claims; and (III) ordering Plaintiffs and Plaintiff-Intervenors to pay the costs of this litigation.

I.

[1] Plaintiffs argue that the trial court erred by holding that the Lottery Act was not a revenue bill, such that it was not required to comply with the requirements of Article II, Section 23 of the North Carolina Constitution. Plaintiffs contend that the Lottery Act's provisions meet all three fiscal conditions to be considered a revenue bill under the state Constitution. We disagree.

The North Carolina Constitution defines revenue bills as those "enacted to raise money on the credit of the State, or to pledge the faith of the State directly or indirectly for the payment of any debt, or to impose any tax upon the people of the State, or to allow the counties, cities, or towns to do so[.]" N.C. Const. art. II, § 23. To pass constitutional muster, such bills must meet certain procedural requirements, namely:

> [Revenue bills] shall have been read three several times in each house of the General Assembly and passed three several readings, which readings shall have been on three different days, and shall have been agreed to by each house respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the journal.

*Id.* Again, all parties to this lawsuit agree that the Lottery Act did not meet these procedural requirements. We therefore turn to the question of whether the provisions of the Lottery Act satisfy the fiscal conditions to define the legislation as a revenue bill.

*Raises money on the credit of the State and
Pledges the faith of the State for the payment of a debt*

Plaintiffs contend that the Lottery Act raises money on the credit of the State and pledges the faith of the State for the payment of a debt because lottery winners are entitled to payment of their respective winnings from the State. We disagree.

First, we note that the Lottery Act explicitly states that "[a]t least fifty percent (50%) of the total annual revenues [of the North Carolina State Lottery Fund] . . . shall be returned to the public in the form of prizes." N.C. Gen. Stat. § 18C-162(a). The Lottery Act also established the North Carolina State Lottery Fund as an enterprise fund "appropriated to the [Lottery] Commission and may be expended without further action of the General Assembly[,]" and defined the Lottery Commission as an "independent, self-supporting, and revenue-raising agency[.]" *Id.* §§ 18C-110, 160. As such, the Lottery Act by its terms establishes that the Lottery Commission, not the State, is responsible for payment of prizes and debts incurred in the course of the administration of the lottery.

Nevertheless, Plaintiffs assert that the General Assembly should have limited the liability to pay lottery prizes to the Lottery Commission and expressly absolved the State from paying lottery winners. Plaintiffs state in their brief that "[a]dmittedly, the Lottery Act specifies that lottery winners are to be paid from lottery revenues . . . , but that legislative directive is irrelevant." We find this argument to be without merit, as the legislative directive would be determinative of any direct action by a lottery winner to recover from the State rather than the Lottery Commission and would reflect that the General Assembly created a dedicated revenue stream, i.e., the sale of lottery tickets by the Lottery Commission, to pay prize winners, as well as a limitation of liability to those revenues.

Further, we see no reason why the sale of lottery tickets should be considered to be the functional equivalent of the issuance of state bonds. With the latter, a consumer chooses to make an investment, essentially loaning money to the State for the financing of certain projects, in exchange for the guarantee that the loan will be repaid with interest, either from the treasury (in the case of general obligation bonds) or from the dedicated revenue stream in question (in the case of revenue bonds). However, with the lottery, a consumer chooses to purchase a ticket that promises only the possibility of winning a cash prize in return. There is no guarantee of payment or any

investment made; the lottery ticket is a simple purchased good that represents the possibility of payment. As such, the State is not "pledging" its faith or credit for a debt it definitively owes. Accordingly, the two are materially different and should not be treated in the same manner under the law.

Moreover, even assuming *arguendo* that a lottery ticket is the functional equivalent of a state bond, tickets would certainly be considered revenue bonds, which do not pledge the State's credit, rather than general obligation bonds, which do. *See, e.g., North Carolina State Ports Auth. v. First-Citizens Bank & Trust Co.*, 242 N.C. 416, 424, 88 S.E.2d 109, 114 (1955) ("[S]uch revenue bonds do not constitute 'debts' of the State agency by which they are issued.") (citing *Brockenbrough v. Board of Water Comm'rs*, 134 N.C. 1, 46 S.E. 28 (1903) and *Williamson v. High Point*, 213 N.C. 96, 195 S.E. 90 (1938)). A revenue bond is distinguished from a general obligation bond because it has both an exclusive, dedicated revenue stream and a statutory limitation of liability to that revenue stream. *See generally North Carolina Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109, 117, 143 S.E.2d 319, 325 (1965) (holding that a bond issued for the Turnpike Authority was a revenue bond, not a general obligation bond, because the statute specified a dedicated revenue stream and a limitation of liability). As noted above, the Lottery Act likewise meets both those criteria.

Our Supreme Court has further remarked that, when considering if the State's faith and credit has been pledged, "[w]hat is being pledged as security is the constitutionally significant factor." *Wayne County Citizens Ass'n for Better Tax Control v. Wayne County Bd. of Comm'rs*, 328 N.C. 24, 31, 399 S.E.2d 311, 316 (1991). Although that case involved a comparison between general obligation bonds, "wherein the taxing power of the governmental unit is pledged," and installment purchase contracts, where "only the property improved is pledged[,]" we find instructive the Court's observation that "[t]he possibility that appropriations which might include income from tax revenues will be used to repay the indebtedness under the contract is not a constitutionally significant factor." *Id.* In the instant case, the statute does not even pledge income from tax revenues; rather, it pledges *only* the revenues raised by the sale of lottery tickets, which is not constitutionally significant.

We observe, too, that the General Assembly established the Education Lottery Reserve Fund to make up for shortfalls. Even more significantly, the number and amount of prizes are determined by

ticket sales and the amount of revenue generated; as such, and given that prizes are limited to only fifty percent of revenues, it is difficult to envision a scenario in which the prizes claimed by winners would ever outstrip the capacity of the Lottery Commission to pay. Moreover, while the dissent would argue that the phrase "[t]o the extent practicable" in N.C. Gen. Stat. § 18C-162(a)(1) does not limit the State's liability, we believe the General Assembly's insertion of this phrase was deliberate and should be taken according to its plain meaning, which is to define and limit the scope of revenue allocation and liability.[3]

Because the Lottery Act neither pledges the faith of the State for payment of a debt nor attempts to raise money on the credit of the State, these assignments of error are overruled.

*Creates an implicit tax*

According to Plaintiffs, the Lottery Act is "an attempt . . . to raise revenue to defray the necessary governmental expenses of providing an adequate educational opportunity for all of North Carolina's children," as required by the State Constitution.[4] While we agree that the lottery is unquestionably intended and designed to raise revenue, we find that this purpose does not transform such revenue into a tax.

We have previously defined a tax as "a pecuniary charge or levy *enforced by government* to raise money for the maintenance and expense of government[.]" *North Carolina Assoc. of ABC Bds. v. Hunt*, 76 N.C. App. 290, 292, 332 S.E.2d 693, 694 (emphasis added),

---

3. Additionally, although the dissent states that "[t]here is no statutory provision prohibiting prize winners from asserting claims against other State funds in the event of a shortfall of lottery revenues[,]" neither is there any provision that would allow a prize winner to assert such a claim against other state funds. The lottery is operated by a separate entity, the Lottery Commission, which does have a dedicated revenue stream—ticket sales—from which it pays prizes. It is unclear under what legal theory a prize winner could bring a successful claim against the State for payment out of other state funds.

4. Plaintiffs do not challenge the creation of the lottery system itself as unconstitutional; instead, Plaintiffs contend that distributing at least thirty-five percent of the revenues from the lottery to the Education Lottery Fund constitutes an unconstitutional tax. Since the establishment of a lottery system itself is not challenged by Plaintiffs, an ostensible remedy to Plaintiffs' tax claim would be to strike that part of the bill directing funds to benefit education. *See, e.g., Jackson v. Guilford County Bd. of Adjustment*, 275 N.C. 155, 168, 166 S.E.2d 78, 87 (1969) ("It is well settled that if valid provisions of a statute, or ordinance, are separable from invalid provisions therein, so that if the invalid provisions be stricken the remainder can stand alone, the valid portions will be given full effect if that was the legislative intent." (citations omitted)).

**HEATHERLY v. STATE**

[189 N.C. App. 213 (2008)]

*disc. review denied,* 314 N.C. 667, 336 S.E.2d 400 (1985).[5] More specifically, "a tax [i]s 'a charge' levied and collected as a contribution to the maintenance of the general government . . . [It is] *imposed upon the citizens in common at regularly recurring periods* for the purpose of providing a continuous revenue." *State ex rel. Utilities Comm'n v. Carolina Util. Customers Ass'n,* 336 N.C. 657, 683, 446 S.E.2d 332, 347 (1994) (citations and quotation omitted) (alterations in original) (emphasis added).

Nevertheless, as noted by our Supreme Court, raising revenue alone is insufficient to meet the definition of a revenue bill: "Revenue bills, as defined by law, are those that *levy taxes in the strict sense of the word* and are not bills for other purposes which may incidentally create revenue." *Hart v. Board of Comm'rs,* 192 N.C. 161, 164, 134 S.E. 403, 404 (1926) (citations omitted) (emphasis added); *see also Carolina Util. Customers Ass'n,* 336 N.C. at 683, 446 S.E.2d at 347 (noting that the collection of funds is not a tax if it "is not a charge *levied upon the general citizenry* for the general maintenance of the government" (emphasis added)). As such, our Supreme Court has also held that, "Tolls are not taxes. A person uses a toll road at his option; if he does not use it, he pays no toll. 'Taxes are levied for the support of government, and *their amount is regulated by its necessities.*'" *Pine Island,* 265 N.C. at 116-17, 143 S.E.2d at 325 (quoting *Ennis v. State Highway Comm'n,* 231 Ind. 311, 323, 108 N.E.2d 687, 693 (1952)) (emphasis added).

For purposes of defining what constitutes a tax, we find the payment of a toll to be analogous to the purchase of a lottery ticket. In both instances, an individual chooses to engage in a purely voluntary activity by paying a fee; in neither situation can the government be said to be "levying" or "enforcing" a charge against citizens. Rather, unlike the compulsory nature of a tax, a toll and participation in the lottery are activities freely undertaken by citizens of their own volition.

---

5. The dissent refers to the *San Juan Cellular* test, applied by this Court in *State Farm Mutual Auto Insurance Company v. Long,* 129 N.C. App. 164, 497 S.E.2d 451 (1998), *aff'd per curiam,* 350 N.C. 84, 511 S.E.2d 303 (1999), to determine "whether a government charge is a fee or tax." Our opinion in *Long* indeed applied the *San Juan Cellular* test to an insurance regulatory charge to determine if it was a regulatory fee or a tax. *Id.* at 168-71, 497 S.E.2d at 453-55. However, the charge imposed in *Long* was compulsory, not voluntary, and was imposed by the Commissioner of Insurance, a state agency, as part of the cost of doing insurance business in North Carolina. *Id.* at 164-65, 497 S.E.2d at 451-52. Moreover, we are not considering here whether the lottery is a regulatory fee or a tax; we are determining only whether it is a tax. As such, the *San Juan Cellular* test is largely irrelevant to the question at hand.

Moreover, unlike a sales tax, the lottery is not imposed on consumers as part of each transaction they undertake with businesses in the State; instead, the Lottery Commission itself is the business selling the product, a lottery ticket, directly to the consumer citizen, who chooses to pay for that product. That citizen—and any other who purchases a ticket—receives the exclusive benefit of the right to a chance of winning the lottery prizes, a benefit that is not conferred upon the general population of the State through the disbursement of state funds. A sales tax, by contrast, is a cost of conducting business in North Carolina and is imposed on all members of the general population; it can hardly be considered to be "voluntary" under any practical definition of the term.

Although the General Assembly openly declared that "the purpose of [the Lottery Act] is to establish a State-operated lottery to generate funds for the public purposes described in this Chapter[,]" N.C. Gen. Stat. § 18C-102, namely, the education-related projects outlined in the Act's provisions, the revenue-raising purpose of the lottery is not the critical factor in determining if the Lottery Act imposes a tax. Indeed, notwithstanding the dissent's focus on "the purpose behind the fee," we note that the purpose behind virtually *any* fee is to raise revenue. Instead, the constitutional language itself answers the question of whether the Lottery Act meets the definition of a revenue bill: "to *impose* any tax." (Emphasis added). Given the voluntary nature of participation in the lottery, we find that the Lottery Act does not "impose any tax upon the people of the State."

For the foregoing reasons, we conclude that the Lottery Act is not a revenue bill within the meaning of Article II, Section 23 of the North Carolina Constitution. Accordingly, we affirm the trial court's grant of Defendants' motion to dismiss.

II.

Next, Plaintiffs argue that the trial court erred by holding that the corporate plaintiffs Wake County Taxpayers Association, the North Carolina Family Policy Council, and the North Carolina Common Sense Foundation lacked standing to prosecute their claims. Because we hold that the trial court did not err in finding that the Lottery Act was not a revenue bill, the question of the corporate plaintiffs' standing to prosecute their claims is no longer relevant. We therefore decline to consider this issue.

## III.

[2] Finally, Plaintiffs argue that the trial court erred by ordering Plaintiffs and Plaintiff-Intervenors to pay the costs of this litigation. We disagree.

In any proceeding under the Uniform Declaratory Judgment Act, "the court may make such award of costs as may seem equitable and just." N.C. Gen. Stat. § 1-263 (2005). Such a decision is within a trial court's discretion. See City of New Bern v. New Bern-Craven County Bd. of Educ., 338 N.C. 430, 444, 450 S.E.2d 735, 743 (1994) ("It was within the trial court's discretion under this statute to apportion costs as it deemed equitable."). A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason. Briley v. Farabow, 348 N.C. 537, 547, 501 S.E.2d 649, 656 (1998). Additionally, under longstanding precedent of the North Carolina courts, if nothing in the record appears to the contrary, we will presume that the trial court exercised discretion in awarding such costs. See, e.g., Wooten v. Walters, 110 N.C. 251, 259, 14 S.E. 734, 737 (1892).

In the instant case, the trial court included in the findings and conclusions of the order that Plaintiffs' allegations were "without merit and should be dismissed," as well as that "no justification has been shown for the delay in initiating this litigation in December 2005[,]" three and a half months after the passage of the Lottery Act. In that time period, the trial court found that the Lottery Commission was established and "hired employees, entered into contracts, collected application fees, expended large sums of money and engaged in other activities necessary for the establishment of a lottery." Furthermore, the trial court noted that "the money expended by the Lottery Commission cannot be unspent[,]" "the legal position and reliance of those who entered into contracts with the Lottery Commission cannot be dimissed[,]" "a large number of people (notably the employees of the Lottery Commission) altered their economic, legal and planning positions in reliance on the Lottery Act[,]" and "it is doubtful that lottery employees could return to their former employment." Perhaps most significantly, the trial court found that "the plaintiffs and plaintiff-intervenors had actual and constructive knowledge of their claims and of the efforts being made to implement the Lottery Act prior to the filing of their respective complaints."

Although Plaintiffs challenge several of these findings of fact on appeal, they do not dispute the truth of the findings related to the

establishment and activities of the Lottery Commission; rather, they contend only that the findings are irrelevant to the legal issues at hand. Nevertheless, we conclude that the findings bear directly on the question of whether the trial court employed reason when exercising discretion to assess costs in this matter. Plaintiffs have failed to make any showing that the trial court abused its discretion in awarding costs beyond conclusory statements to that effect.[6]

In light of the trial court's findings, as well as the presumption we accord the trial court that it exercised discretion, we decline to find an abuse of discretion in ordering Plaintiffs to bear the costs of this litigation. This assignment of error is overruled.

Affirmed.

Judge HUNTER concurs.

Judge CALABRIA dissents by separate opinion.

CALABRIA, Judge, dissenting.

Since I conclude that the Lottery Act is a revenue bill that was not passed in accordance with constitutional mandates, I respectfully dissent from the majority opinion. I further conclude that the trial court abused its discretion in determining plaintiffs should bear the costs of this action.

### I.  Revenue Bill

Article II, Section 23 of the North Carolina Constitution states in pertinent part:

No law shall be enacted to raise money on the credit of the State, or to pledge the faith of the State directly or indirectly for the payment of any debt, or to impose any tax upon the people of the

---

6. We emphasize again that we review the trial court's imposition of attorneys' fees for an abuse of discretion. As such, our agreement or disagreement with its decision is immaterial; rather, to reverse its ruling, we must conclude that the trial court had no reasonable basis to support its decision. Although we—and the dissent—may define what is "equitable and just" differently than did the trial court here, we cannot conclude after reviewing the extensive and thorough findings of fact and conclusions of law that the trial court employed no reason in imposing attorneys' fees on Plaintiffs. Accordingly, the proper application of our standard of review compels that we find no abuse of discretion.

State, or to allow the counties, cities, or towns to do so, unless the bill for the purpose shall have been read three several times in each house of the General Assembly and passed three several readings, which readings shall have been on three different days, and shall have been agreed to by each house respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the journal.

N.C. Const. art. II, § 23.

The principles governing constitutional interpretation are generally the same as those "which control in ascertaining the meaning of all written instruments." *Stephenson v. Bartlett*, 355 N.C. 354, 370, 562 S.E.2d 377, 389 (2002) (internal quotation marks omitted) (citations omitted). In determining the will or intent of the people as expressed in the North Carolina Constitution, "all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument." *State ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989) (quoting *State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944)). If the meaning of the language of Article II, § 23 is plain, then we must follow it. *See Martin v. State of North Carolina*, 330 N.C. 412, 416, 410 S.E.2d 474, 476 (1991) ("where the meaning is clear from the words used we will not search for a meaning elsewhere.") (quotation omitted). In the case *sub judice*, the language regarding raising money on the credit of the State, pledging the faith of the State for payment of a debt, and not imposing a tax is straightforward. Yet, the majority incorrectly concludes the Lottery Act does not raise money on the credit of the State, does not pledge the faith of the State for the payment of a debt, and does not impose a tax, and therefore does not constitute a revenue bill.

The majority holds that because the Lottery Act establishes the Lottery Commission as an independent agency and pays prize winners from the pool of lottery revenues, that the State has not raised money on its credit or pledged its faith for payment of a debt. The relevant statutory provision states as follows:

§ 18C-162. Allocation of revenues

(a) *To the extent practicable*, the Commission shall allocate revenues to the North Carolina State Lottery Fund in the following manner:

(1) At least fifty percent (50%) of the total annual revenues, as described in this Chapter, shall be returned to the public in the form of prizes.

N.C. Gen. Stat. § 18C-162(a)(1) (2005) (emphasis supplied).

This provision makes it clear that while the State intends to pay lottery winners from lottery revenues, it has not expressly limited its liability to lottery revenues. Thus, although lottery proceeds are used to pay prize winners "to the extent practicable," there is no statutory provision prohibiting prize winners from asserting claims against other State funds in the event of a shortfall of lottery revenues. *Id.* The majority mistakenly asserts that a dedicated revenue stream alone is sufficient to insulate the State's liability to that particular revenue stream, but such is not the case.

The State's obligations created by the Lottery Act can be analogized to the sale of state bonds. The State at times finances projects with revenue bonds backed by a dedicated revenue stream, as the State has done with the creation of the Lottery Commission. Revenue bonds are not general obligations of the State when the State has taken care to limit its liability to the revenue stream identified to service the debt. *See generally Turnpike Authority v. Pine Island, Inc.*, 265 N.C. 109, 117, 143 S.E.2d 319, 325 (1965). Here, the State has failed to limit its liability in any way, although it certainly could have chosen to do so. Such a limitation of liability would have prevented the Lottery Act from raising money on the credit of the State or pledging its credit for the repayment of a debt, and would have successfully circumvented Art. II, § 23.

By selling lottery tickets, the State is contracting with purchasers for the opportunity to have a claim for State revenues, but it has neither dedicated an exclusive revenue stream from which they are to be paid nor has it limited its liability to such a revenue stream. As such, a prize winner may assert a claim generally against the State and thus the State has pledged its credit for payment of prizes. This fact alone makes the Lottery Act a revenue bill for purposes of Article II, § 23.

Contrast the language of N.C. Gen. Stat. § 18C-162(a)(1), which does not require payment from lottery revenues to lottery winners, with the language enabling the sale of bonds by the North Carolina Housing Authority, which states:

An authority shall have power to issue bonds from time to time in its discretion for any of its corporate purposes. An authority shall

also have power to issue or exchange refunding bonds for the purpose of paying, retiring, extending or renewing bonds previously issued by it. An authority may issue such types of bonds as it may determine, including (without limiting the generality of the foregoing) bonds on which the principal and interest are payable from income and revenues of the authority and from grants or contributions from the federal government or other source. Such income and revenues securing the bonds may be:

(1) Exclusively the income and revenues of the housing project financed in whole or in part with the proceeds of such bonds;

(2) Exclusively the income and revenues of certain designated housing projects, whether or not they are financed in whole or in part with the proceeds of such bonds; or

(3) The income and revenues of the authority generally.

Any such bonds may be additionally secured by a pledge of any income or revenues of the authority, or a mortgage of any housing project, projects or other property of the authority.

Neither the commissioners of an authority nor any person executing the bonds shall be liable personally on the bonds by reason of the issuance thereof. *The bonds and other obligations of an authority (and such bonds and obligations shall so state in their face) shall not be a debt of any city or municipality and neither the State nor any such city or municipality shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said authority. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation of the laws of the State.* Bonds may be issued under this Article notwithstanding any debt or other limitation prescribed in any statute.

This Article without reference to other statutes of the State shall constitute full and complete authority for the authorization, issuance, delivery and sale of bonds hereunder and such authorization, issuance, delivery and sale shall not be subject to any conditions, restrictions or limitations imposed by any other law whether general, special or local.

N.C. Gen. Stat. § 157-14 (2005) (emphasis supplied).

The State, in passing the Lottery Act, could have added similar language to the statute and limited lottery prizes to lottery revenues. However, it chose not to do so. Absent a limiting provision, the State has exposed itself to claims against general funds and thus has pledged the credit of the State of North Carolina.

In determining that the Lottery Act does not constitute a tax, the majority incorrectly focuses on the voluntary nature of purchasing a lottery ticket. This Court has adopted the balancing approach commonly called the *San Juan Cellular* test, first articulated by Judge Breyer of the First Circuit Court of Appeals, in determining whether a government charge is a fee or tax. *See State Farm Mut. Auto. Ins. Co. v. Long*, 129 N.C. App. 164, 168, 497 S.E.2d 451, 453 (1998). In *State Farm*, this Court specifically utilized the *San Juan Cellular* test:

> In applying *San Juan Cellular* to determine whether a charge is a tax, courts have developed a three-part test considering (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed.

*Id.*, 129 N.C. App. at 168, 497 S.E.2d at 453-54 (internal quotation marks omitted) (citations omitted). The majority incorrectly states that because the *Long* Court applied the *San Juan Cellular* test to determine whether a government charge was a regulatory fee or tax, the test is "largely irrelevant" to the case *sub judice*. However, our opinion in *Long* did not restrict the *San Juan Cellular* test solely to cases where this Court must determine whether a charge is a regulatory fee or a tax.

Applying the *San Juan Cellular* test to the case *sub judice* leads to the conclusion that the thirty-five percent assessment is a tax. First, the General Assembly imposed the assessment, and such enactments favor the finding of a tax. *See id.*, 129 N.C. App. at 168, 497 S.E.2d at 454. Second, the assessment is imposed on every purchaser of lottery tickets. *Id.* ("An assessment imposed upon a broad class of parties is more likely to be a tax . . . .") (quoting *Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996)). Third, the purpose of the assessment is to raise revenue for education programs which is a "general public purpose[]." *Id.*; *see* N.C. Gen. Stat. § 18C-102 (2005) ("The General Assembly declares that the pur-

pose of this Chapter is to establish a State-operated lottery to generate funds . . . ."). Unlike a fee, the assessment does not merely create incidental revenue used for education. Rather, the revenues generated are placed in a special state fund unrelated to gambling which indicates the assessment does not merely create incidental revenue used for education.

This Court has defined a tax as "a pecuniary charge or levy enforced by government to raise money for the maintenance and expense of government." *N.C. Association of ABC Boards v. Hunt*, 76 N.C. App. 290, 292, 332 S.E.2d 693, 694 (1985). The majority analogizes lottery revenues to toll revenues, which we have held are not taxes. *Turnpike Authority*, 265 N.C. at 116-17, 143 S.E.2d at 325. Likewise, we have held that a surcharge on liquor is not a tax. *N.C. Association of ABC Boards*, 76 N.C. App. at 293, 332 S.E.2d at 695. However, in those cases we noted that the surcharge was a fee and not a tax because the revenue was used to support the administration and regulation of the facility or product, and was not used "to provide revenue for the maintenance and expense of government." *Id.*

The toll revenue and liquor surcharge cases are distinguishable from the case *sub judice* because in those cases, the use of the fees is reasonably related to the facilities generating the fees. Although the revenue may find its way into the general fund coffers, the purpose of the facilities is not primarily to raise general revenues but to provide a service. As such, the surplus revenues are incidental to the operation of the facilities.

As in the toll revenue and liquor surcharge cases, the key point in the case *sub judice* is the purpose behind the fee. The majority focuses on whether a person voluntarily chooses to purchase a lottery ticket. Yet, it does not matter whether a person voluntarily chooses to purchase a lottery ticket or voluntarily chooses to pay a toll. Virtually every purchase is voluntary and the majority's analysis would convert nearly every assessment, including a general sales tax, into a "fee."

Rather than focusing on the voluntary nature of purchasing a lottery ticket, the focus must be on the purpose behind the fee. The purpose of a toll payment is to generate funds to pay for state highway expenses. However, the purpose of the lottery is to raise revenues for North Carolina's education fund. As such, the revenues raised are not incidental to the game nor reasonably related to the maintenance and

operation of the game, but are central to the game's purpose; therefore the revenues from the lottery are taxes. The Lottery Act is unconstitutional because it is a revenue bill and was not passed in accordance with the constitutional mandates pursuant to Article II, § 23.

The majority opinion correctly states that all parties to the lawsuit agree that the Lottery Act was not passed in compliance with the constitutional requirements, outlined in Article II, § 23 of the North Carolina Constitution, as the Lottery Act did not receive the requisite three readings on three separate days, nor were the yeas and nays properly entered. Neither the trial court nor the majority opinion propose a solution to an act that is a legal nullity.

The trial court was faced with a case of first impression. Therefore, as a practical matter, the trial court found that the Lottery Commission was established and "hired employees, entered into contracts, collected application fees, expended large sums of money and engaged in other activities necessary for the establishment of a lottery." The trial court also noted that "the money expended by the Lottery Commission cannot be unspent[;]" "the legal position and reliance of those who entered into contracts with the Lottery Commission cannot be dismissed[;]" "a large number of people (notably the employees of the Lottery Commission) altered their economic, legal and planning positions in reliance on the Lottery Act[;]" and "it is doubtful that lottery employees could return to their former employment." These are valid concerns, but they cannot be our only concerns. Constitutionally-mandated procedures are a concern of the highest order, and they may not be estopped by a hurry to sell lottery tickets.

If it is our Legislature's will that there be a statewide lottery, it may gather and pass a measure that is constitutionally sound. This decision has a 20 day mandate. A twenty day period is ample time for the Legislature to cure the constitutional defects in the Lottery Act.

Our State legislators may not skirt our State's constitutional mandates simply because the Lottery Commission already is an established, ongoing business. This is not to suggest the Lottery Commission should refund or return any money that our State treasury previously transferred to it, nor to suggest halting the lottery. While there is nothing in our State's Constitution prohibiting the enactment of a lottery, such an act must, as all our laws must, follow constitutional commands.

## II. Attorneys' Fees

The majority disagrees with the plaintiffs' contention that the trial court erred by ordering plaintiffs and plaintiff-intervenors to pay the costs of this litigation. In affirming the trial court's award of costs to plaintiffs and plaintiff-intervenors, the majority cites N.C. Gen. Stat. § 1-263 (2005), which states, "In any proceeding under this article the court may make such award of costs as may seem equitable and just." The trial court's award of costs will not be reversed absent an abuse of discretion. *See City of New Bern v. New Bern-Craven Co. Bd. of Educ.*, 338 N.C. 430, 450 S.E.2d 735 (1994). Specifically, "[a] trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *Castle McCulloch, Inc. v. Freedman*, 169 N.C. App. 497, 504, 610 S.E.2d 416, 422 (2005).

In the case *sub judice*, the trial court found that plaintiffs' allegations were "without merit and should be dismissed," as well as that "no justification has been shown for the delay in initiating this litigation in December 2005." I disagree that a valid constitutional challenge to enacted legislation with meritorious arguments should be dismissed. More importantly, there was a justification for the December 2005 litigation.

The trial court found that "the plaintiffs and plaintiff-intervenors had actual or constructive knowledge both of their claims and of the efforts being made to implement the Lottery Act prior to the filing of their respective complaints." However, the trial court's reasoning for imposing costs to plaintiffs because of their "actual or constructive knowledge" is wrong. On 17 November 2005, plaintiffs hand delivered letters addressed to the Chairman of the Lottery Commission, Dr. Charles A. Sanders, State Treasurer, Richard H. Moore, and Attorney General Roy Cooper. Significantly, each letter notified the defendants of possible legal action to challenge the constitutionality of the Lottery Act and demanded that defendants refrain from carrying out the Lottery Act. On 15 December 2005, less than 30 days after notifying the defendants, plaintiffs filed suit.

In addition, although plaintiffs may have been generally aware of the terms of the proposed lottery, they were unaware of its provisions until its enactment. Because plaintiffs were unaware of the Lottery Act's specific provisions until the lottery was implemented, they could not allege a constitutional challenge to specific sections of the Lottery Act. Moreover, as plaintiffs note, this case is one of great

complexity requiring extensive research due to multiple issues requiring constitutional interpretation.

In conclusion, Article II, § 23 is applicable to the Lottery Act. Imposing costs upon litigants who bring forth important constitutional challenges to legislation may have a chilling effect on such challenges in the future. It was not "equitable and just" to determine that plaintiffs bear the costs of this action. N.C. Gen. Stat. § 1-263. The plaintiffs' allegations are meritorious. The trial court abused its discretion in ordering plaintiffs and plaintiff-intervenors to pay the costs of litigation. Since there is no dispute that the Lottery Act was not passed in accordance with that constitutional provision, it is a legislative nullity. Therefore, the judgment of the trial court should be reversed.